## Statement Regarding Twelve Oaks Tower
## Hurricane Ike Claim Events
## Prepared by Donice Axelson
### September 22, 2009 – September 28, 2009



My name is Donice Renae Axelson.   I was born in Victoria, Texas on November 7, 1969. I am 39 years of age.  I am a U.S. citizen and my social security number is [to be supplied].  I became a licensed CPA in the state of Texas in 1994 and have maintained my CPA license for the last 15 years.  See copy of Texas Driver's License and CPA License issued by the Texas State Board of Public Accountancy (#064235) at Attachment A and resume through the year 2000 at Attachment B.

From 2000 until approximately July 2008, I left full-time employment to attend to family responsibilities. In approximately July 2008, I was hired as a consultant by Medistar Corporation to perform a brief assignment reviewing the financial records and operations of a small hospitality property in Houston, Texas owned by Medistar.  This assignment lasted approximately one month.  After reporting my findings and recommendations to Mr. Monzer Hourani, CEO of Medistar, and Mr. Robert Hodge, CFO of Medistar, I was immediately retained to begin an unrelated assignment.

The new assignment involved reviewing the property management operations and financial records of five medical office buildings owned by the company, with the primary focus on reducing operating expenses in order to improve profitability.  Four of these properties are located in Houston, Texas and one is located in Dallas, Texas  Two of the Houston properties included 4126 Southwest Freeway (referred to as "Twelve Oaks Tower") and 4140 Southwest Freeway (referred to a "River Oaks Physicians Plaza" or "ROPP.")  This work included visiting the properties, meeting with property management, evaluating steps currently taken to control costs, and making additional recommendations regarding cost control and operational efficiency.

Shortly prior to Hurricane Ike which occurred on September 13, 2009, I had toured both Twelve Oaks Tower and ROPP with Tammy Pizzitola, Cushman and Wakefield property manager.  However, I did not complete this assignment until after Hurricane Ike hit at which time I reported my findings and recommendations to Mr. Hourani and Mr. Hodge.  Shortly thereafter, I was offered a permanent position with Medistar Corporation which I declined due to my family obligations.  However, I agreed to continue working for the company in a consulting capacity to the extent that I had time available.  Beginning in approximately October 2008, I set up an office at Medistar Corporation.  Prior to this time, I had worked out of my home.

I was given various assignments including restructuring the accounting and financial reporting processes and implementing the cost reduction recommendations which had resulted from my prior assignment.  On approximately November 14, 2008, I met with Tammy Pizzitola to discuss these cost reductions. However, the meeting quickly became focused on the extensive Hurricane Ike recovery efforts related to these properties.  I reported this information in a memo to Monzer Hourani, at which time he asked me to take over responsibility for managing the insurance claims relating to this damage. Medistar properties sustaining Hurricane Ike damage included Apex Hospital, Twelve Oaks Tower and 6565 Demoss which are all located in Houston, Texas and all insured with Safeco Insurance.

Since November 14, 2008, I have worked almost exclusively on coordinating Medistar's Hurricane Ike recovery efforts and managing the related insurance claims processes.  In November 2008, Adjusters International was also engaged to assist in the Hurricane Ike claims for all of the properties sustaining

damage. Scott Davidson, Principal with Adjusters International, has been the primary individual assisting Medistar on the Twelve Oaks claim. I have communicated with Mr. Davidson almost daily regarding the status of the claim since he was retained in November 2008.

I also had primary responsibility for providing the extensive amount of documents requested by Safeco relating to this claim. I personally searched computer files, files obtained from our storage warehouse, and files stored at the property management office at 4126 Southwest Freeway in an attempt to locate documents specifically requested by Safeco as well as any other documents that may assist in the settlement of this claim.

In addition, along with Paul Voivedich, I reviewed and approved invoices related to Hurricane Ike remediation and repair activities at Twelve Oaks Tower. I prepared a spreadsheet of all these invoices along with all supporting documentation (proposals, contracts, timesheets, etc.). These documents were provided to Safeco for reimbursement under the policy. Therefore, I am familiar with most of the construction-related and inspection activity that has occurred at the building since the storm.

In addition, I have attended almost all meetings which have been held by Medistar discussing the engineering aspects of this claim. I would estimate that I have attended at least 50 meetings with other Medistar personnel as well as our engineering consultants where major discussions were held regarding the structural damages to the building related to Hurricane Ike and possible repair methodologies.

Using the correspondence between Safeco and Medistar as the basis, I have prepared a timeline of significant claim activities over the past year. Due to the extensive volume of documents, such timeline is not intended to be comprehensive. I have added my comments related to the events which appear to be the most pertinent to the settlement of this claim.

The following is a summary of individuals and companies related to the claim and referenced in the attached timeline:

| | |
|---|---|
| ACT | Contractor recommended and paid by Safeco to board up the windows of Twelve Oaks Tower after Hurricane Ike |
| Apollo | Apollo BBC, engineering firm retained by NAE to perform structural evaluation of Twelve Oaks Tower |
| Armadillo | Armadillo Glass, contractor which replaced the exterior glass on Twelve Oaks Tower in 2007. Armadillo also performed an inspection of the building post-Hurricane Ike. |
| B. Hodge | Bob Hodge, C.F.O, Medistar |
| D. Axelson | Donice Axelson, C.P.A., consultant for Medistar |
| D. Fuhr | Dale Fuhr, Employee of WJE, Safeco consultant |
| D. Lightfoot | Debbie Lightfoot, Executive Assistant to Monzer Hourani, Medistar CEO |
| D. Powell | Dick Powell, Adjusters International, assisted S. Davidson on this claim |
| EFI Global | First structural engineering firm hired by Safeco to evaluate damage to Twelve Oaks Tower |

| E. Nelson | Erik Nelson, structural engineer and head of NAE, who was retained by Safeco to evaluate Twelve Oaks Tower |
| G. Baker | Gene Baker, President of GBI Partners, survey firm hired by NAE |
| G. Boyd | Gary W. Boyd, Structural engineer retained by Medistar related to this claim |
| GBI | GBI Partners, survey firm who performed survey of building for NAE |
| Haynes Whaley | Structural engineering firm representing Medistar on this claim |
| J. Courtney | Jerry Courtney, President of Façade Consultants, who represented Medistar during the exterior survey of the curtain wall |
| J. Whitted | Johnny Whitted, Consultant with Meridian |
| L. Karkabi | Lee Karkabi, Owner of World Express Insurance Agency and agent who placed coverage for the building with Safeco Insurance |
| M. Hopmann | Mark Hopmann, Engineer employed by WJE |
| M. Hourani | Monzer Hourani, CEO of Medistar |
| M. Thompson | Mark Thompson, Executive Vice President with Haynes Whaley |
| Meridian | Consultant hired by Safeco to perform moisture mapping of the building |
| NAE | Nelson Architectural Engineers, structural engineers hired by Safeco who evaluated structural damage to 4126 Southwest Freeway, including the roof and the garage |
| P. Nilles | Paul Nilles, President, TC3, Safeco's construction consultant |
| P. Voivedich | Paul Voivedich, Senior Construction Manager for Paladin Construction |
| Paladin | Paladin Construction, a related party to Medistar Corporation and the general contractor which performed interior repairs to the building post-Hurricane Ike |
| S. Andersen | Scott Andersen, Construction Consultant with TC3 |
| S. Davidson | Scott Davidson, Adjusters International Principal with primary responsibility for this claim |
| S. Martin | Susie Martin, current Asset Manager for Medistar and prior property manager at 4126 Southwest Freeway |
| S. Parker | Sandy Parker, General Adjuster to Safeco Insurance assigned to this claim |
| S. Liker | Steve Liker, TC3 Project Manager |
| T. Pizzitola | Tammy Pizzitola, Cushman and Wakefield Property manager for 4126 Southwest Freeway at the time of Hurricane Ike |
| TC3 | Construction consultant hired by Safeco |

| TRC | The Restoration Company, the contractor hired to perform remediation services in the immediate aftermath of Hurricane Ike |
|---|---|
| WJE | Wiss, Janney, Elstner Associates, engineering firm hired by Safeco to evaluate the building façade |

In addition, graphs of Medistar and Safeco engineering experts and reports issued by these engineers and other professionals are included as Attachment C.

# *Timeline of Key Events*

*Note: Information regarding events marked by an asterisk (\*) was obtained from timeline prepared by Sandy Parker, Safeco. See Ms. Parker's timeline at 09.13.08 A.*

At M. Hourani's request, T. Pizzitola also prepared two documents that provide timelines of events taken to prepare the property for the storm as well as post- Hurricane Ike recovery efforts. See undated report from Ms. Pizzitola (attachment 09.13.08B) as well as letter dated December 17, 2008 (see attachment 09.13.08C).

**September 13, 2008\*** Hurricane Ike struck. T. Pizzitola was present at the property the day of the storm surveying damage. She notified Lee Karkabi, our insurance agent, and reported significant damage.

See photos of interior damages at Attachment 09.13.08D.

**September 14, 2008\*** The primary focus was restoring power, boarding up windows, removing wet carpeting and sheetrock, and ensuring that the air quality was satisfactory, especially due to the fact that the property is a medical office building which also includes surgical facilities. T. Pizzitola hired TRC who installed dehumidifiers and other equipment.

**September 19, 2008** Frank Patout, Senior Vice President of Development with Medistar, also accompanied T. Pizzitola on an inspection of the building in the aftermath of the storm. F. Patout's report of damages is included as Attachment 09.19.08A.

**Excerpts:**
"Several windows had been sucked out due to negative pressure on the window wall. In some cases the window wall frames had been ripped loose from the structure and bent....Many of the windows flexed so much that the horizontal bar in the windows had been ripped loose or had fallen out."

"The window wall is attached at the floor and the bottom of the beam supporting the floor. In some case both of these attachment points are ripped loose. In some cases this brace occurs on floors with asbestos on the beams. In some cases asbestos has been knocked from the beams and structure by water and wind."

"As Tammy and I walked the building that day I pointed out to her an example of the tremendous force that the hurricane and possibly tornadic force winds exterted on the building as exemplified by the crushed sheet rock mud that had fallen on the horizontal surface below the "X" brace. Above the crumbs the vertical

window mullion is partially wrapped on three sides by the sheet rock that encased the building diagonal "X" bracing on the western side at about the 13th floor. It was obvious that the crushed sheet rock mud had fallen out due to the movement of the two elements in different directions."

**September 20, 2008\*** The first Safeco adjuster arrived at the property one week after Hurricane Ike struck. Safeco immediately reassigned the claim to S. Parker based on the scope of the loss. Ms. Parker immediately authorized TRC to provide two generators to power the remediation equipment.

**September 21, 2008\*** Meridian, Safeco's consultant, began preparing moisture maps of the building. Ms. Parker and Ms. Pizzitola agree to add extra security, repair the fire alarm, perform air quality testing, board up the windows, secure a structural engineer to inspect the curtain wall, and inspect the roof damage.

*Comment*: All remediation was directed by J. Whitted with Meridian (Safeco's consultant).

**September 23, 2008\*** EFI Global performs their fieldwork. ACT boards up the window of concern.

**September 24, 2008\*** Meeting held between S. Parker, TRC, Meridian, P. Voivedich (Paladin), and T. Pizzitola. It was agreed that Paladin will perform repair work on a time and material basis.

**September 26, 2008\*** Safeco hires TC3 as a construction consultant.

**September 29, 2008\*** Paladin removes TRC from the job. Paladin Construction gives S. Parker a signed contract to perform Hurricane Ike repairs at the building.
*Comment*: According to P. Voivedich, S. Parker was provided a draft agreement. He does not recall an agreement ever being signed. If a signed agreement exists, Paladin and Medistar would like to obtain a copy.

**September 30, 2008\*** Paladin begins demolition/remediation work.
*Comment*: All remediation was directed by Safeco's consultant, Meridian – J. Whitted.

**October 1, 2008** S. Parker e-mails claim update to L. Karkabi and states that the expected repair time is 8 to 12 weeks for the entire building. See Attachment 10.01.08A.

**October 6, 2008** Initial date of fieldwork for all NAE reports (roof, garage and building)
*Comment:* Information obtained per review of NAE reports.

**October 10, 2008** Safeco receives EFI Global report and forwards to Medistar (Attachment 10.10.08A).

*Comment:* When I became involved in the Twelve Oaks Hurricane Ike claim in November 2008, Mr. Hourani requested that I immediately review the EFI report. He could not believe that any professional engineer would write such a report with unsubstantiated findings. For instance, EFI concluded that the curtain wall did not sufficiently withstand the forces of Hurricane Ike because of corroded connections. However, at the same time, EFI stated that they couldn't examine these same connections because of the presence of spray-on fireproofing.

Furthermore, Mr. Hourani has repeatedly stated that the statements made by EFI Global regarding Armadillo Glass were complete misstatements. EFI stated in their report that Armadillo Glass was in the process of evaluating the connections of the glass to the precast panels prior to Hurricane Ike.

## Excerpt (page 3 of EFI Report):

"Rusting of the surfaces that are in contact in the steel angle/spandrel beam connection has produced enough scale to force the connection apart. This process was occurring a long time prior to the subject storm event. This connection was not visible for inspection due to the presence of fireproofing (emphasis added). The wind loads on the building during the subject storm event created vibrations and lateral loads on many of these connections that resulted in severe damage to localized sections of the exterior window certain (sic) wall. The proximate failure of these connections is corrosion induced failure and not from wind loading during the subject storm event."

## Excerpt (page 4 of EFI Report):

"It is our understanding, that Armadillo Glass Company was involved in work on the connections prior to the storm event (emphasis added). We understand that the double angle connections were in process of examination and/or restoration. Some angle were temporarily repaired or modified prior to the storm event. We do not know the scope of this work effort (emphasis added)."

See letter dated November 4, 2008 from M. Hourani to Sandy Parker rebutting the EFI report (see Attachment 10.10.08B) along with his handwritten comments on the EFI report (see Attachment 10.10.08C) which were also sent to Ms. Parker.

*Comment:* Although EFI Global completely excluded the exterior hollow-core panels from its investigation and report, in Mr. Hourani's letter to S. Parker he states at the bottom of page 2, "Additionally, the hollow core panels and columns are bowing and deflecting due to extreme wind pressure, and these elements can be hazardous to the life and safety of people (emphasis added)."

In addition, M. Hourani wrote an additional rebuttal to the EFI report dated September 18, 2009 (see Attachment 10.10.08D).

## Excerpt:

"On one hand, EFI states that the failure is due to the high wind load causing vibrations. However, when making a definitive conclusion, EFI states that the 'proximate cause of failure of these connections is corrosion induced failure and not from wind loading during the subject storm event. EFI is trying to assign all blame for the failure not on the Hurricane Ike winds but on corrosion which EFI is *assuming* is present. This faulty, unsupportable conclusion is made for the sole purpose of allowing Safeco to deny the claim (emphasis added)."

*Comment:* In several subsequent meetings with Safeco, I have been present when Ms. Sandy Parker has stated that Safeco will not place any reliance on this report and indicated that the EFI report will not be used to make a claim determination.

In my opinion, the receipt of this report by Medistar set this claim on the "wrong path." When EFI's unsubstantiated report was received by Mr. Hourani who is a highly-qualified structural engineer, Medistar formed an initial impression that Safeco intended to hire engineers who would issue opinions in favor of the insurance company regardless of the facts.

**October 14, 2008\***      Meeting regarding status of repairs and outstanding estimates at loss location.

**October 15, 2008**      Received preliminary scope notes for damages from TC3. P. Voivedich sends Armadillo's preliminary budget to Safeco (Attachment 10.15.08A).

**October 17, 2008\***      Meeting held between Safeco and Medistar. Sandy Parker stated that she will hire Nelson Architectural Engineers (NAE) to perform additional structural review and address Mr. Hourani's concerns regarding the plumbness of the building. Also Sandy stated that asbestos was found in the beams and notified the Insured's representatives again that there is no coverage for the asbestos removal.

     *Comment*: According to Ms. Parker's timeline and prior to Safeco's receipt of Mr. Hourani's rebuttal, a meeting was held between representatives of Medistar and Safeco. To their credit, Safeco agreed to hire NAE to perform a more detailed structural evaluation. Whereas EFI Global only examined two sides of the curtain wall, NAE would evaluate all four sides.

     In addition, Mr. Hourani had discussed with Ms. Parker that he had concerns regarding the plumbness of the building, because he felt that the building's steel frame may have permanently deflected as a result of the prolonged hurricane-force winds. It was agreed that NAE's report would also address this issue. As Ms. Parker had listened to Mr. Hourani's concerns and stated that they would be formally addressed, Medistar continued to hope that engineers and other professionals hired by Safeco would perform a full and fair investigation of the loss.

**October 20, 2008**      S. Parker sends e-mail summary of October 17, 2008 meeting (Attachment 10.20.08 A).

     *Comment:* Whereas on Sandy Parker's timeline, she states that at the October 17, 2008 meeting she told the Insured that asbestos is excluded from coverage, in this email she describes asbestos abatement as a *pending* coverage issue. During the meeting at Medistar on September 2, 2009, the asbestos issue was discussed and Ms. Parker said that she would talk to her legal counsel and provide a coverage decision to Medistar on Friday, September 4, 2009. To date, no response has been received. **Over ten months** have passed since the initial discussions of the asbestos issue, and still Medistar doesn't have a coverage opinion from Safeco on this issue.

**October 22, 2008\***      2nd date of fieldwork for all NAE reports (per review of NAE reports).

**November 4, 2008**      M. Hourani letter to S. Parker regarding the EFI report is issued which contains Medistar's first **written** notice to Safeco regarding concerns about the hollow core panels. (See related comment on October 10, 2008).

**November 7, 2008\***      Paladin submits invoices and billings to date to Safeco.

**November 10, 2008**      NAE issues "Hurricane Distress Analysis I" regarding condition of roof (Attachment 11.10.08A).

     **Excerpt:** "Based on the observed conditions, available documentation, and analysis, NAE is of the opinion that the cause of distress at limited areas of the subject roofs is related to wind from Hurricane Ike and more generally aging and deterioration of the roofing system."

Armadillo Glass issues letter, photographs and drawings regarding their physical inspection of the curtain wall (Attachment 11.10.08B).
*Comment:* Armadillo Glass reported the following findings:
- 277 loose mullions
- Curtain wall perimeter caulking – 90% failed
- Concrete panel caulking – 90% failed
- Glass Panels – 98% scratched
- Armadillo also noted that the "temporary plywood panels were anchored thru the concrete building panels which will require repairs and repainting."

**November 20, 2008**
M. Hourani emails S Parker that Dr. Masson's surgery center smells like mold and mildew and there is a possibility that a hollow core panel could detach. Safeco needs to take action, because Medistar can't risk problems with doctors and tenants, especially when our slogan is "Medistar- Developing Healthy Buildings." See Attachment 11.20.08A.

**Excerpt:**
"The situation is simply unacceptable for Safeco to ignore this building and allow more water damage, mold and mildew in operating rooms that can be an extremely disastrous situation. Compounding this problem, the building is no longer safe and possibly some of the hollow-core panels will fall down and injure or kill people. I simply want an answer to this seriously neglected situation that can threaten the safety of innocent people."

*Comment:* This is Medistar's second **written** notice to Safeco regarding concern about the hollow core panel connections.

S. Parker Response: Ms. Parker provides detailed timeline of events and supporting documents which she believes supports her claim that Safeco has fulfilled their fiduciary obligations on this claim (Attachment 11.20.08B). According to T. Pizzitola, a number of the statements by Ms. Parker were incorrect. Ms. Pizzitola's comments are indicated in red. See Attachment 11.20.08C).

NAE issues "Hurricane Distress Analysis II" regarding the garage structure (Attachment 11.20.08D).
*Comment:* Per review of the report, the only distress NAE contributed to Hurricane Ike was minor wind damage to light poles and fixtures and missing insulation at the equipment penthouse.

**December 1, 2008**
NAE issues their first report on the structure of the building, "Hurricane Distress Analysis III." (Attachment 12.01.08A)

Excerpt:
"A limited external review of the precast panels did not indicate any significant distress. However, it should be noted that special equipment (lift) would be required for a close evaluation of the precast panels. NAE recommends the complete review of the precast panels (emphasis added) be performed under a separate assignment." (Page 5)

*Comment:*
Safeco did retain the services of Wiss, Janney and Elstner, WJE, to perform a comprehensive survey of the building exterior, including the precast panels. This

survey began in December 2008 and WJE's findings are documented in their report, "Exterior Wall Condition Survey," dated February 13, 2009 (see Attachment 02.14.09A). However, this report was not a "complete review of the precast panels" as recommended by NAE because, with limited exceptions, it only included an investigation of the *exterior* of the precast panels, not the *interior* side of the panels where the structurally significant connections are located.

Excerpt:
"EFI Global, Inc. (EFI) prepared a report dated October 9, 2008 with opinions of the cause of distress at the curtain wall system. The EFI report discusses some connection problems that appeared to have existed prior to the storm event. EFI reported that Armadillo indicated that the connections were in the process of examination and restoration prior to Hurricane Ike (emphasis added)."

"It is NAE's opinion that this information is critical to fully comprehend the sequence of events leading up to the curtain wall failures (emphasis added). Further, based on this information it is possible that some of the curtain wall connections had failed or were structurally distressed prior to Hurricane Ike."

*Comment:* NAE states that the information that connections were in process of examination and restoration prior to the storm is critical to understanding the sequence of events. NAE relies on EFI Global's representations which, as stated previously, Medistar strongly disagrees with. It is interesting that NAE puts such reliance on statements made by EFI Global when EFI did not perform a thorough investigation of the issue and admitted, 'We do not know the scope of this work effort (emphasis added).'"

Excerpt:
After describing the survey results, NAE states, "There is no pattern of out-of-plumbness in the data to indicate significant deflection of the structure due to lateral loads. Additionally, the distress patterns at the curtain wall are not consistent with lateral movement of the frame, but rather suction loads applied at the corners. As discussed previously, the reported wind speeds were below the code referenced design wind speeds for the structure, further supporting lateral movement of the building to be in the elastic range (no permanent deformation expected). It is NAE's' opinion that these offsets are minimal and most likely construction related. Therefore, it is our further opinion that the structure has not "racked" as a result of Hurricane Ike."

*Comment:* Mr. Hourani, who had previously expressed his serious concerns regarding the plumbness of the building, was understandably alarmed when he received NAE's report which showed that the building was significantly out-of-plumb. However, he had difficulty making sense of NAE's report, especially Sheet SE-1 which is a graph of the building survey results and illustrates the out-of-plumbness at various heights and corners of the building.

Therefore, although Medistar's CEO, Monzer Hourani, is a highly qualified structural engineer, Mr. Hourani decided to retain an independent structural engineer, Gary W. Boyd, P.E., to assist in analyzing the findings issued by NAE. A number of meetings were held between Mr. Hourani and Mr. Gary Boyd at Medistar's offices. I participated in most, if not all, of these meetings.

Much discussion was held regarding the effects of Hurricane Ike on the structural integrity of the Twelve Oaks Tower. Mr. Hourani repeatedly expressed his concerns regarding a permanent deflection of the steel frame caused by Hurricane Ike. Furthermore, regardless of whether a permanent deflection had occurred, concerns were raised that the hollow core panels likely sustained significant structural damage, as they do not have the same elasticity as the building's steel framing.

Much of the discussion with Gary Boyd focused on attempting to make sense of NAE's Sheet SE-1 containing the survey data. Gary Boyd produced graphs of the out-of-plumbness contained in Sheet SE-1 to try to analyze whether a pattern existed (these graphs are attached to Boyd Engineering's "Interim Engineering Report, Number One" provided as Attachment 01.14.09B). Such detailed analysis only lead to more questions than answers, and frankly, much frustration.

While NAE's report showed that the building was out-of-plumb by almost six inches, the report did not give sufficient explanation for such a finding. Gary Boyd pointed out that the out-of- plumbness reported by NAE significantly exceeds steel erection tolerances for a building the height of Twelve Oaks Tower. If the building had exhibited such out-of-plumbness at the time of construction, it would have not passed inspection by the architects and engineers involved in the project, or by City of Houston building inspectors.

Much internal discussion was also held regarding the survey methodology. Mr. Hourani was aware that the survey data contained in NAE's report was based on the façade (the panels and glass comprising the exterior of the building) which may or may not be representative of the steel frame. Mr. Hourani has stated innumerable times (both internally and to Safeco representatives) that the only way to determine whether the building's steel frame deflected would be to remove the panels at all four corners of the building, thereby exposing the steel frame and allowing a true survey of the plumbness of the steel structure. To date, this type of survey has not been conducted.

Mr. Hourani's issued a response to this report on September 23, 2009 (Attachment 12.01.08B).

M. Hourani Excerpt:
Regarding Nelson's recommendation to perform a complete review of the precast panels, M. Hourani stated, "Why did Safeco not hire Dr. Nelson for this "separate assignment,' since the precast panels are loose and their structural integrity is in question? Why did Safeco wait nearly four months to engage WJE to finally begin this work? Then when we finally received WJE's 'comprehensive report' in February 2009, we determined it to be wrong, as WJE (which operated under unreasonable scope limitations set by Safeco) missed the most significant structural damage to the building's façade (emphasis added)."

Armadillo Glass issues response dated December 8, 2008 addressing NAE's "Hurricane Distress Analysis III" (Attachment 12.01.08C).

Armadillo Excerpts:
Regarding NAE's statement that no wind related distress was observed at the single panel windows, Armadillo responded, "We inspected every panel of glass one year before and again after 'Ike'. The caulking split between vertical mullion

and precast panel is obvious stress on both aluminum frame and on precast panel. Without stress the caulk joint would not have failed."

Regarding NAE's review of EFI report, Armadillo stated, "We have not been on this building for (1) year prior to Hurricane Ike therefore, this statement is incorrect."

F. Patout, Medistar, issues memo to M. Hourani regarding "Review of NAE Documents on 12 Oaks Window Wall (Attachment 12.01.08D).

F. Patout Excerpts:
F. Patout stated that NAE's report "indicated that only a visual 'walk-though' of the two-panel curtain wall and limited observation was made of the single panel glass and precast panels. It is difficult to draw accurate conclusions with insufficient facts."

"NAE did not examine the precast panels and this was outside NAE's scope. Obviously this needs to be checked."

*Comment:* Another point to note is that, like the EFI Global report, the NAE report specifically *excluded* the precast panels from their evaluation. Therefore, both engineers hired by Safeco up to this point issued reports about the structural condition of the building without addressing the precast panels, which along with the glass, comprise the building's facade.

| | |
|---|---|
| **December 8, 2008** | Medistar's initial request for meeting with Erik Nelson of NAE. Mr. Hourani and Gary Boyd were not able to resolve their many questions regarding NAE's report in general, and the survey data, in particular, through their own discussions and analysis. Therefore, Medistar contacted Sandy Parker on December 8, 2008 and began requesting a meeting with Dr. Nelson to discuss his findings. However, the soonest that Dr. Nelson was available was December 22, 2008. (See Attachments 12.08.09A and 12.09.09B) |
| **December 9, 2008** | D. Powell requested additional $500,000 advance (Attachment 12.09.08A). |

M. Hourani emails S. Parker regarding delays in receiving NAE's report and delays to meet with NAE regarding their report. M. Hourani indicates that he is available to meet immediately with E. Nelson to address structural issues and states that "it will be necessary that you look seriously at the safety of the patients and people coming to this medical building and also the possibility of flying objects and falling hollow- core columns, pilaster and glass on top of the cars traveling on Highway 59…" (Attachment 12.09.08B).

*Comment:* This is the third written notice to Safeco regarding Medistar's concerns with the panels.

S. Parker Response: Discusses Safeco hiring NAE and WJE and refers to Medistar's "Duties in the Event of Loss."

**Excerpt:**
Regarding the risk of falling objects, S. Parker stated, "Mr. Fuhr has been retained by Safeco to address only the Curtain Wall System, which he started to do on Monday, December 8, 2008 and has already sent recommendations to secure the board up better so the type of incident you are referring to does not occur. We

have requested that your public adjuster, Scott Davidson, secure a contractor of your choice to do these repairs, but provide us with a verbal estimate prior to commencing the work as soon as possible. Armadillo had done 41 drops at your request to view the curtain wall system and over 1 ½ months has transpired and we have no complete report and it appears that the boards for the board up are still a concern and our engineer, WJE, has now provided a way to properly secure these so nothing will happen."

*Comment:* S. Parker's comment addresses the risk of falling plywood and possibly glass; however, it does not address the risk of panel detachment. Ms. Parker's comments regarding WJE providing a method to "properly secure" the board up are addressed at length later in this report.

Excerpt:
"Safeco has been proactive with attempting to assist Medistar with the assessment of damages to the loss location since September 20, 2008 and I do not agree with any of the statement set forth in your e-mail regarding your implications of delay tactics, misrepresentation tactics, etc. These is fully supported by the experts we have retained, the reports we have secured, etc."

*Comment:* Medistar could not disagree more strongly with S. Parker's comment. The experts which Safeco has retained and reports that Safeco secured validate Medistar's opinion that we have not been treated fairly and honestly regarding his claim.

EFI, the first engineering consultant, issued an unsubstantiated report containing clear misstatements of facts, and therefore, Safeco has indicated that they will not rely on this report.

Next, Safeco hired NAE which issues a report which contains material misrepresentations of the building's survey data. NAE's erroneous report would have gone unchallenged if the building owner on the claim had not been a qualified engineer. However, in this case, NAE was forced to issue a revised report. As of today, Medistar has not received sufficient answers to determine which NAE report (or neither) contains correct information.

At the time that this email was written, Medistar had no idea that WJE, the latest engineering consultant hired by Safeco, would spend two months of fieldwork at the property performing a "comprehensive" survey of the building's exterior curtain wall, while still not fully investigating the interior side of the panels. This investigation would only be performed after Medistar identified the cracks, because Safeco would not authorize WJE to perform a thorough investigation.

Also, instead of attributing damage to corrosion (which is a policy exclusion) as concluded by EFI Global, WJE elected to attribute damage primarily to inadequate design and construction (a different policy exclusion). This gives the impression that Safeco employs engineers and consultants that "pick and choose" between policy exclusions in order to unjustly deny claims.

| December 17, 2008 | Date of WJE Plywood Strapping Calculations. See drawings and calculations at Attachment 01.05.09A. |

**December 19, 2008**   Serene Wongsa (WJE) sends Plywood Strapping Specs to S. Andersen. See drawings and calculations at Attachment 01.05.09A.

**December 18, 2008**   $500,000 advance received by Medistar

**December 22, 2008**   A meeting was held at Twelve Oaks Tower to discuss NAE's report along with Mr. Hourani's concerns regarding the structural integrity of the building and the garage. Attendees included M. Hourani, G. Boyd, D. Powell, S. Liker, E. Nelson and D. Axelson.

*Comment:* After touring the property with Dr. Nelson and discussing the parking structure, Mr. Hourani's initial concerns regarding cracks in the garage were alleviated. On the contrary, however, after having significant discussion regarding NAE's report, and specifically his findings regarding the plumbness of the building, Mr. Hourani and Mr. Boyd had many unanswered questions. Several times Dr. Nelson stated that he would have to do some research and respond back to us, particularly with regard to the GBI survey data contained in Sheet SE-1. However, we heard not one word from Dr. Nelson for one full month.

Frankly, I was quite surprised by Erik Nelson's lack of response. As a C.P.A., if someone challenged the accuracy of a certified report which I had prepared, I would have immediately investigated to determine whether or not an error had occurred and would have issued a correction if warranted.

**December 23, 2008**   P. Voivedich notifies S. Andersen that the board up design is rejected by M. Hourani (Attachment 12.23.08A)

**Excerpt:**
"Scott, this detail of the securing of the exterior plywood is here by rejected by Monzer Hourani, PE. Another design is needed; the attachment to the panels is not the solution (emphasis added). Twenty four fasteners per panel are a major over kill, also dangerous due to the fact that the panels maybe part of the problem (emphasis added)."

*Comment:* This is at least the fourth written notice to Safeco regarding Medistar's concerns regarding the condition of the panels.

S. Parker Response: Ms. Parker asks Medistar to propose alternate board up methodology and Not To Exceed (NTE) cost to address "potential public safety issue with board up." (Attachment 12.23.08A)

**Excerpt:**
"At this time this is the recommended repairs by WJE. Inasmuch as the insured and his contractor are not in agreement with this repair method, please provide us with the method you are recommending and with a NTE cost from Paladin to perform the work. As stated in previous correspondence, the insured needs to mitigate his damages as necessary and we are responsible for paying for the damages that are a direct result of the hurricane…I look forward to receiving the insured's proposal for the securing of the board up and the NTE to perform the work as soon as possible as we all have a concern of a potential public safety issue with the boardup (emphasis added)."

*Comment:* The "damages" due to the incorrect and inadequate plywood board up are due to ACT Catastrophe, a contractor recommended and paid by Safeco, not Medistar. Although Medistar agrees that the board up is not secure, Medistar seriously believes that the methodology recommended by WJE could potentially create an even bigger "public safety issue" as fastening Hilti bolts into the panels could cause panel detachment in panels that are already damaged.

**December 24, 2008**    Dale Fuhr sends email to P. Voivedich standing behind plywood board up design and calls Medistar's actions "gamesmanship." See Attachment 12.24.08A.

### Excerpt:
"WJE stands behind the design provided to properly secure the plywood in accordance with the current wind pressures included in the code...It is certainloy (sic) apparent to any engineer that the thickness and attachment method originally used does not and will not meet the code requirements. We encourage the owner to design and provide his own recommendations. We have evaluated the west, south and east elevations and *have not yet observed any indication that the building panels have experienced any damage* (emphasis added) caused by Hurricane Ike or any other weather event. WJE feels that the continued claims by the owner or his agents that the building might be, or is unsafe is greatly overstated."

"WJE will continue to deal in engineering logic and not participate in what appears to be gamesmanship (emphasis added)."

### Comments:
WJE did not stand behind the design when they attempted to rescind the board up drawing on January 28, 2009 (See Attachment 01.28.09A). However, as stated by Gary W. Boyd, WJE cannot rescind the drawings (See Attachment 01.28.09B).

Safeco's own consultant acknowledges that the job done by ACT, under Safeco's direction, was inadequate when D. Fuhr states that it is "apparent to any engineer that the thickness and attachment method originally used does not and will not meet the code requirements."

Mr. Fuhr states that he has seen no evidence of panel damage and that Medistar's claims are overstated. Ironically, WJE eventually came to the very same conclusion regarding safety risks and issued letters as such. See WJE's letter dated January 15, 2009 regarding "Exterior Wall Panel Corner Crack Issue" at Attachment 01.15.09A and WJE's letter, "Notification of Distressed Conditions" at Attachment 01.29.09 B.

**December 29, 2008**    Page Southland Page (architectural firm) sends letter regarding their review of the exterior building envelope damage caused by Hurricane Ike. See Attachment 12.29.08A.

### Excerpt:
"...in many locations the precast concrete panels have also detached from the structure creating a major safety issue for anyone standing or driving below. A structural engineer could give a better explanation for why this is occurring but it would seem the entire structure is deflecting laterally, twisting and buckling causing the precast concrete panels and curtain walls to disengage from the structural supports."

**December 31, 2008**   S. Parker acknowledges M. Hourani's concern about plumbness of the building. However, Ms. Parker wants to postpone meeting until <u>after</u> her engineers have issued their reports (Attachment 12.31.08A).

**Excerpt:**
"It is my understanding that Mr. Hourani has some specific concerns regarding the plumbness of the building and how our experts are going to check this without removing the skin of the building."

"In the interest of having an unbiased report prepared by WJE (emphasis added), it is my recommendation that there (sic) report is completed based upon their findings of their physical inspection of the loss location that has taken place over the last 30 days and is expected to be completed in January, 2009. Upon completion and review of the written report by all involved parties we would be more than willing to entertain a meeting to discuss at that time."

*Comment:* Ms. Parker's comments about wanting WJE to prepare a report which is not biased by the reports of other engineers is incomprehensible. Ms. Parker should want her consultants to communicate to ensure that each had all available information with which to make an accurate assessment of the structural damages.

Ms. Parker's comment is especially interesting since WJE states in their February 13, 2009 report that they have obtained information from the review of other consultant's reports concerning this project, including reports by EFI Global, Nelson's Hurricane Distress Analysis III and IV, and Apollo BBC.

It is also ironic that she doesn't want the insured to discuss findings with her engineers before they issue their reports, especially considering the fact that nine days before this email was sent, Medistar and its consultants met with Dr. Nelson to point out to him suspected errors in his report. These errors resulted in NAE having to revise its report. Safeco should have welcomed input from the insured in order to prevent such embarrassing mistakes by their consultants.

**January 5, 2009**   WJE Plywood Strapping Calculations are sealed by Mark Hopmann (Attachment 01.05.09A).

P. Voivedich email to D. Fuhr regarding connections of glass and precast panels and discusses safety risks (Attachment 01.05.09B).

**Excerpt:**
"Bottom line, Medistar cannot gamble with people's lives (emphasis added) and Medistar needs the building to withstand future hurricanes and storms. Also according to Medistar and their engineers and consultants; there is a problem with deflection in the building. The question is whether it is the steel framing or the precast panels and the glass panels (emphasis added). In either case we have problems with the closeness to Hwy. 59; and because the building is still partially occupied with disgusted tenants. Safeco's method and strategy does not fully take into consideration of people's safety; because we are now working on four months and the building is not getting any better."
*Comment:* This is at least the fifth written notice to Safeco regarding Medistar's concerns regarding structural integrity of the panels.

S Parker Response: S. Parker emails P. Voivedich and D. Fuhr that Owner has responsibility to mitigate losses. S. Parker requests Armadillo contract, permits, and any engineering reports about deflection (Attachment 01.05.09B).

**Excerpt:**
"We are the insurance carrier and this is not our building. The insured needs to take whatever steps they feel are necessary to mitigate the loss and any future losses as a result of the damages, pre-existing or existing conditions to their building. We will pay the amounts incurred that are directly attributable to the damages as a result of Hurricane Ike and are not excluded under the policy contract. WJE anticipates having their inspection/investigation of the curtain wall system completed by the end of this week with a written report to follow within 7 to 14 business days."

*Comment:* To determine the damages attributable due to Hurricane Ike, shouldn't the insurance company perform a full and fair investigation? It is ironic that EFI excluded the panels from its investigation as did Nelson. WJE located panel cracks, but Safeco would not authorize additional investigation. Finally, after prompted by Medistar's own investigation, Safeco authorized WJE to investigate the interior panel cracks. However, this report was not issued until May 20, 2009.

Safeco's delays in performing a full investigation of the loss delayed payments by the insurance company. It is Medistar's position that full payment, and even payment of all undisputed amounts, has not been made even though more than a year has passed since Hurricane Ike. Payments are needed to fund the substantial repairs that are anticipated. This is why Medistar purchased the insurance, so that funds would be available to repair the building in the event of a catastrophe, such as Hurricane Ike.

**January 6, 2009**    S. Parker estimates that Safeco's estimates and written reports will be completed by January 31, 2008. She states that she wants to have agenda prior to any meeting (Attachment 01.06.09A).

**Excerpt:**
"In order to meet the timeline I have requested all my experts and consultants need to stay focused and will not be available for any meeting unless it is deemed necessary for them to complete their report and estimates."

M. Hourani approves board up as long as WJE supervises. Medistar again states that panels are loose. See Attachment 01.06.09B.

**Excerpt:**
"Medistar raised their concern before regarding the drawings and procedures of W.J.E. in securing the initial plywood on the damaged building, because we would simply be trying to attach new plywood to the precast members that are loose (emphasis added). This e-mail is to let you know that after a discussion with some engineers, Medistar will accept WJE's method as long as the installation is supervised by a WJE registered engineer to ensure the safety of others and provide us with sealed drawings and thorough supervision of the installation based on safe engineering and construction methods."

*Comment:* This is at least the sixth written notice to Safeco regarding Medistar's concerns with the panel being loose or otherwise compromised.

S Parker Response: Ms. Parker states that WJE is not supposed to facilitate repairs. WJE will only "view the repairs after the work is completed." See Attachment 01.06.09C.

**Excerpt:**
"WJE was not not (stet) retained to facilitate the repairs to the loss location, that is the responsibility of the insured to hire a contractor of their choice to do the actual repairs. Again, as to when, how and who these repairs are completed by is the insured's obligation and responsibility. We simply provided the insured a copy of the recommended repair to secure the board up at the loss location with drawings to provide to the contractor of their choice to complete the actual repairs."

"At this time I would recommend that whomever the insured contracts to do this work secure the necessary qualified individuals they feel are necessary to oversee the work. It is NOT common for an engineer to remain on sight during the repair process (emphasis added). However, that being said the reason the board up issue was originally raised is because it is the responsibility of an engineer to advise the building owner of a potential public safety issues once they are known. Safeco was also notified as a courtesy because we have retained WJE to provide us with a written report of their opinion of the necessary repairs to the curtain wall as a direct result of Hurricane Ike. After speaking with my experts and consultants we would be willing to have WJE review the completed work of the contractor whom the insured chooses to complete the repairs (emphasis added)."

*Comment:* In addition to the fact that attaching loose plywood to loose panels would violate basic engineering principles, Medistar was also concerned about WJE's repair methodology because of "warning labels," so to speak, included on their Plywood Covering Temporary Repair drawings. Sheet SK-2 shows an arrow pointing to an existing prestressed reinforcement in the hollow-core panel and states, "Notify WJE immediately if hit and stop work on the installation." Sheet SK-3 states, "Immediately notify WJE if drop-in anchors do not tighten appropriately." Warnings such as this are what prompted Medistar to request WJE to supervise the repair to the board up. Medistar's concerns are real and not "gamesmanship" as stated by D. Fuhr in his December 24, 2008 email.

**January 7, 2009**     GMZ Painting issues letter regarding not seeing major cracks when repainting the exterior of Twelve Oaks Tower in 2007 (Attachment 01.07.09A).
**Excerpt:**
"...There were not any cracks noted in any of the precast panels that were painted...It is our practice to notify the owner of properties that we paint for any cracks or problems in any surface we paint. This practice is obvious since it creates an opportunity for more revenue since we do repairs. 12 Oaks panels did not have any note worthy cracks when we performed our painting."

**January 13, 2009**     Lee Karkabi emails S. Parker regarding the fact that four months have passed since Hurricane Ike. We need to meet and finalize this claim (Attachment 01.13.09A).

S Parker Response (to Lee Karkabi): She wants to delay meeting until 1st week of February after experts have finished reports (Attachment 01.13.09A).
**Excerpt:**
"I do not think a meeting would be beneficial until we have our estimate completed and our reports written. I have a date of January 31, 2009 to have all of these in my possession for review by myself and upper management. I would

recommend that we schedule a meeting after we forward this information to the insured and the insured has a chance to review. I anticipate that will be sometime during the 1st week of February, 2009."

**January 14, 2009**     Lee Karkabi to S. Parker – Medistar would like meeting sooner, especially due to safety concerns with plywood board up (Attachment 01.14.09A).
**Excerpt:**
"Monzer is and has been, since the Hurricane, worried about the safety of the building and has taken every step possible to assure that fact. He has concerns about the way you are recommending bracing the building by reinforcing the wood panels that are deemed unsafe."

S. Parker issues response to Lee Karkabi regarding damage estimates, engineering reports and plywood board up (Attachment 01.14.09A).
**Excerpt:**
"We have continually advised the insured that if they have concerns regarding our experts bracing recommendations to retain their own expert and provide us with the cost to do the bracing they feel is necessary. Again this is the insured's building and not Safeco's. The insured needs to do what is necessary to protect his building and to maintain his building."
*Comment:* Safeco's recommended contractor, ACT Catastrophe, created this problem with the board up, Safeco supervised the installation and Safeco paid them for their inferior work. Now Safeco expects Medistar to solve this problem when Safeco's engineers could not devise a safe and acceptable solution.

**Excerpt:**
"At this time Safeco has been diligently working on damage figures that were as a direct result of the hurricane and will provide those to all parties for review. If the insured and Safeco are not in agreement with the evaluations, there is the Appraisal portion of the policy to resolve these issues."
*Comment:* How could Safeco determine damage figures when they still had not performed a complete investigation? WJE was still completing its first report (not issued until February 13, 2009) which did not include an evaluation of the interior panels. WJE's second report was not issued until May 20, 2009.

Gary Boyd issued his first report, "Interim Engineering Report, Number One" which addresses numerous unanswered questions regarding NAE's report as well as WJE's plywood board up design (Attachment 01.14.09B.)

**Excerpts:**
"The NELSON report opined '…*the building…*" experienced lateral movements as a result of the hurricane winds that were, ' …*in the elastic range (no permanent deformation expected)…*'. Such an opinion would have to exclude the fact that the claddings (precast panels, etc.) would have an elastic range with far less flexibility than that of the structural steel frame. The structural steel frame might be able to deflect (bend, torque and/or the "P-Delta" effect), and, the structural steel frame might be able to return to its original position without '…*permanent deformation…*',but, *the claddings, especially the concrete panels, do not have elasticity; the panels are brittle.*"

"The NELSON report also concluded from the _SK-1_ survey data that the "…*offsets are minimal and most likely construction related.*" This engineer expressed disagreement that the "offsets are minimal" in that a 5 or 6 inch *"out-of-*

*plumbness"* half way up a 17-story building is significantly beyond construction tolerance, even for the early 70's when the building was constructed."

**January 15, 2009**   WJE issues letter re: "Exterior Wall Panel Corner Crack Issue" (Attachment 01.15.09A).

M. Hourani issued a response dated September 21, 2009 to this WJE letter. See Attachment 01.15.09B. Due to its significance, the entire response is copied below. The text of the WJE original letter is shown in black and M.Hourani's response is shown in red..

---

Monzer Hourani's Responses in Red Issued 9-21-09

---

This email is in reference to the conditions found regarding the corner cracks in the hollow core precast wall panels at approximately 70 locations on the building. **Is it interior or exterior?** (We are still tabulating our field data, so these quantities are approximate at this time.) Refer to the attached photographs for examples of these conditions. Approximately 80% of these corner cracks occur at the bottom of the panels (which would correspond to the location of their gravity/lateral connections to the building). While more of these cracks tend to occur at the corner zones of the building, **(why? because as I have told everyone since day 1, the corners of the building were subjected to higher wind forces)** there are also similar cracks throughout the field of the walls on the building. It should also be noted that we have located approximately 30 locations of vertical cracks (approximately 5 of the 30 are full panel height) that occur on the exterior face of the panels. **No additional distress was observed. Have you examined all the interior face of the panels? The exterior so-called cracks are only surface shrinkage of concrete. They were never routed or sealed and refer to our painter's letter, dated January 7, 2009, when the outside of the building was completely painted. The hairline cracks in some of the outside panels are not at all real cracks or structural cracks, but a hairline of surface crack that was never a problem.** These cracks have also previously been routed and sealed, and no additional distress was observed in these repairs. **These were regular shrinkage cracks.**

When we identified these cracks from our survey drops on the exterior of the building, we recommended that materials on the interior of the building at these cracks be removed to better determine the severity of the cracks. To date, we have been able to observe 5 cracks on the interior side of these wall panels (4 on the 13th floor; 1 on the 9fu floor). Of these 5 locations, 4 correspond to exterior cracks at the same location, thus potentially making them through-wall thickness cracks. These interior cracks had not been repaired; therefore, the connections have to be assumed to be compromised.
**So you admit that the interior cracks "had not been repaired". It simply means that they are new cracks and you also say these cracks "correspond to exterior cracks at the same location, thus potentially making them through wall thickness cracks. Also, when we asked you in our January 22nd meeting why you did not check the rest of all interior cracks in the building, you said Safeco did not want you to do that and Safeco did not give you authorization to do that, which is unbelievable.**

The corner cracks observed on the interior of the building require further

evaluation to attempt to determine the age of the cracks and whether they may have been caused by Ike. This can be done by determining the level of carbonation of the cracks and checking to see if any materials (paint, surface patching materials, etc.) placed on the surface of the panels extend into the depth of the cracks. These distressed locations could have also resulted from improper original design or construction. **(Again, how can fresh cracks that you can see now be due to improper design and construction in 1972 and also fresh structural cracks that were caused by tremendous wind stresses on the concrete panels resisting the torsion twisting and deflecting of the corners of the building. These cracks will naturally have loose concrete, debris and other materials that are pushed and naturally forced in the cracks. Just look at the 16 reports from 16 different subs and contractors who never saw these cracks during all the time from 1997 until 2007, and 16 subs are ready to testify that if anyone had seen such structural cracks, then the management company, their company and the Landlord would be immediately notified. How on earth could any of these sheetrock subcontractors, electrical contractors or other interior contractors just install sheetrock on these structurally cracked panels?**

Based on the fact that the cracks on the exterior of the building were apparently routed and sealed at the time (or prior to) when the coating was placed on the exterior surface of the wall panels, the repaired cracks occurred prior to Ike. **There were never any structural cracks and WJE is not telling the truth.** Whether or not these cracks were further distressed by Ike is not completely certain at this time. However, the previously repaired corner cracks on the exterior of the building showed minor signs of distress (cracking or adhesive/cohesive failure) of the repair material on only approximately 5% of the repaired locations. Ike mayor may not have caused this additional distress at these few locations. **What does it mean that Ike may or may not have caused these additional cracks? This is not an engineering expression. You are also saying that "the exterior of the building showed minor signs of distress". Do you mean in shrinkage cracks in concrete?**

We recommend that structural analysis and further field evaluations of these connections be performed so that recommendations of proper repair details can be developed and installed. These interior crack locations must be repaired and in a timely manner. **Why did you not do a structural analysis or at least why did you not correctly perform your job by inspecting the interior corner cracks which are very severe and dangerous, especially as you are now saying "these cracks must be repaired in a timely manner.** Since floor 13 is vacant, perhaps even temporary support for these panels can be provided until final repair details can be designed and installed. Because we do not have any structural drawings of these connections, we would recommend that these evaluations include attempts to determine the exact detailing of the connections before repairs are conducted, in order to properly determine the appropriate corrective measures required. We also recommend that all the locations that have exterior cracks be surveyed to determine if they have thru-wall thickness cracks. **WJE gave us a "solution" to correct the initial mistake of Safeco and ACT by installing the plywood to hold the glass, which was bowing, and to screw the plywood to the concrete panels with 12 HILTI expanded bolts on each side of the panels to secure plywood and holding deflected glass to the panels. Now WJE is asking that these panels be braced "even temporary support for the panels can be provided until final repair details can be designed and installed". The question is how is WJE proposing to brace and support the plywood and strap it to the precast panels if the panels need to be stabilized? WJE cannot stand by its "solution" of securing the plywood to the concrete panels that WJE is advising us to also brace these panels. This is wrong.**

You may or may not wish WJE to proceed with the evaluation of these cracks, since it appears they may be pre-existing conditions. Therefore, this may be a condition the Owner needs to evaluate. Please let us know how you would like us to proceed on this item. **This is another**

misrepresentation of WJE in this report to Safeco. Sandy Parker, with all the time WJE spent, why did WJE not evaluate the interior cracks in other floors besides the 9th and 13th floors where they found 4 cracked panels out of 5? These cracks are fresh cracks due to the hurricane, and WJE is misrepresenting the fact by saying this is a "pre-existing condition". It is very obvious. Also, if WJE or Safeco or NAE analyze in proper engineering the real deflection and torsion of this narrow and tall building resisting on the 4 corners the tremendous wind stress, WJE and Safeco and NAE will possibly find that the outside corner panels are cracked from the inside of 45° of the seat of concrete panels due to the high resisting shear forces at the connection due to the tremendous wind that lasted 9 hours in which the entire building had passed through twisting and deflection.

D. Axelson emails S. Davidson regarding rent abatements and states that some tenants are "granting themselves abatements" by not paying their rent. S. Davidson requests response from S. Parker (Attachment 01.15.09C).
S Parker Response: "I have no issue with abating 15 to 30 days rent for the tenants immediately following the hurricane, but I need to confirm with my accountants as to who has paid, who is not, etc."No response received. See Attachment 01.15.09C.

D. Axelson sends letter dated January 14, 2009 to S. Parker along with 3 due diligence reports and Gary Boyd's January 14, 2009 report. Letter states that Medistar does not have an alternate board up methodology (Attachment 01.15.09D).
**Excerpt**:
"I am enclosing the following which I just unearthed late last week:

1. Due Diligence Survey dated August 1, 2003 by Gresham, Smith and Partners
2. Sealed Letter dated December 2, 2003 to Gary Perryman, President of Medistar, from Floyd Cooper, P.E., Senior Vice President, Design/ Construction
3. Property Condition Report related to Twelve Oaks Tower and Garage prepared by Terracon dated June 20, 2005

In addition, I am enclosing a report, "Interim Engineering Report, Number One" from our structural engineer, Gary W. Boyd, P.E., which we received today.

From my review of these reports and discussions with Mr. Hourani, the management company, and other knowledgeable

individuals, it was my impression that the building was in fairly good shape prior to the hurricane. I strongly encourage you and any experts that you have retained to read the reports and to discuss these reports with us, so that you are apprised of all facts and can base claims decisions and payments on facts rather than guesses from experts whom the insurance company has retained only after the loss occurred.

Mr. Hourani has been emotionally troubled by the hurricane damage and the length of time it has taken to obtain full payment and promises of payment based upon a methodology to repair the Hurricane Ike damage. Mr. Hourani is a renowned structural engineer and intimately familiar with building design, construction and repair. He simply cannot understand why you and your engineering consultants are not immediately meeting with him to go over the facts of the loss and exactly what is being hypothesized as the best way to correct all the hurricane-related damage. I do not know what to tell him as to the reason why neither you nor the engineers you have selected will immediately meet with him.

Regarding ACT Catastrophe and the work regarding the initial board up, Safeco recommended ACT Catastrophe and directly paid ACT for the board up of the windows. The inadequate board up is attached to the precast panels which may be loose. The loose panels present a very major safety concern that needs to be addressed by Safeco immediately. Your email implied that the situation for safety is totally up to us without acknowledging that Safeco is responsible for the prompt payment of this insurance claim and with the payment reflecting a repair methodology.

We need to know what your repair methodology for the hurricane damage is, what you are going to pay for it, and the actual payment of those sums as soon as possible. The reason why the insurance was purchased in the first place was to provide prompt and full financial payment so those repairs can be made. It is your job to promptly investigate all aspects of this loss, and then promptly pay the full amount of benefits based upon those findings, while conducting a full investigation with us. It places us in a "catch 22" situation to tell us to go pay for safety repairs when you do not tell us that you are going to pay for such repairs.

I do not mean for this letter to sound harsh or to finger point. Instead, Mr. Hourani is emotionally distraught and has been asking me these questions, and pointing out that the insurance company owes him services which should be performed promptly, as well as prompt payment of the claim. I can only ask you to place yourself

in his shoes, and ask your supervisors to give you enough time, money and manpower to take care of the very significant issues which we are facing. The next hurricane season will quickly be coming upon us, and Mr. Hourani is quite concerned about attempting to repair a building in the middle of another hurricane season given the very close proximity of this building to Highway 59. His firm and reputation has been established by building safe and functional structures for the medical profession. As a matter of fact, Medistar's slogan is "Developing Healthy Buildings." The last thing we would want to happen would be to harm anyone because of miscommunication in an action regarding this insurance claim."

### Excerpts from Due Diligence Reports:

### *Gresham Smith and Partners July 28, 2003*

- *The Southwest Freeway Tower medical office building exterior seems to be in good shape, with the exception of one area which indicates water infiltration on the north face.*

- *Ten of the seventeen floors of the Tower have been gutted and redone to an excellent level. Asbestos has been abated in each of these floors and spray fireproofing put back at a cost of $10.25 per square foot.*

- *The mechanical system for the Tower MOB is in excellent condition and should last for another 20 to 25 years if properly maintained.*

- *The plumbing, medical gas and fire protection systems of the Southwest Freeway Tower MOB are in average condition for the age of the facility. Any interior renovation can be supported by the existing systems. The phased sprinkler upgrades, mentioned earlier as part of the floor-by-floor upgrade to the building, need to be continued until all remaining seven floors have been completed.*

- *The existing main normal electrical power system in the 4126 Southwest Freeway Tower is in need of inspection. If any major renovations are proposed the existing main electrical equipment including the outdoor switchboard should be physically inspected and tested to insure the safe and full operation. .*

- *The present work of upgrading the fire alarm system on rest of the floors should be continued with a plan to upgrade the main panel in the near future. The elevators were investigated, and*

*quoted to be upgraded. Any elevator upgrade project should include the fire alarm and devices, controls and power shut-downs to comply with current codes.*

### *Floyd Cooper December 2003*

*Suzie Martin, with Twelve Oaks, accompanied us on our inspection of the facilities. The seventeen-story building has pre-cast exterior wall panels that are in very good condition, and there are no visible signs of any cracks. The structure is composed of steel framing and the floor system is 6" thick hollow core Houdaille concrete panels with a two-inch concrete topping. There was some minor rusting on the structural steel bracing for the wall panels above the roof. The structure appears to be in very good condition, and there is no evidence of any structural problems.*

### *Terracon– June 20. 2005*

o *Terracon completed this Property Condition Report for the Twelve Oaks Tower and Garage located at 4126 Southwest Freeway in Harris County, Houston, Texas. The Twelve Oaks Tower is a 17-story multi-tenant professional medical building constructed in 1973 containing approximately 150,960 square feet (s.f.) of gross building area and approximately 139,944 s.f. of net rentable area on a 1.481-acre parcel of land (entire medical center site). There is an 11-level parking garage adjacent and north of the office tower building attached by an enclosed pedestrian walkway.*

o *The project is located west of downtown Houston bounded by Portsmouth Avenue on the north, Interstate I-59 (Southwest Freeway) on the south, Las Palmas Street on the east and Drexel Drive on the west. Parking is provided on the site for 938 cars including 14 handicap-parking spaces.*

o *The office tower is a structural steel frame with structural steel beams and columns supporting precast concrete flat planks. The penthouse structural is a metal deck supported by steel bar joists, steel beams and columns. The garage structure is precast concrete double tee's, inverted beams, concrete columns with haunches, and perimeter concrete vehicular restraining walls with tendon restraint cables. The foundation system is a concrete slab on grade with building loads supported by concrete footings. The exterior of the building consists of painted pre-cast concrete double tee walls and single-pane glass with solar*

film set in aluminum frames. The tower has a drop-off/pickup patient canopy on the south side with concrete columns and a roof similar to the main tower roof with skylights. The main roof consists of a gravel surface asphalt built-up roof membrane with internal roof drains and thru-wall emergency drains. Access to the roof was through a personnel door.

o   Interior finishes in the entrance lobby are typical for their occupancy and type of use including granite tile floors with marble inserts, marble walls or wallpaper, 2' X 2' regular ceiling tiles with T-8 fluorescent lights and/or painted drywall vaulted ceilings with architectural inserted light fixtures. Single-pane automatic sliding doors provide access to the tower from the garage through a covered walkway. There is a manual operated revolving glass door at the main building south entrance lobby. Office interior finishes are commensurate with Class "A" type office spaces. The parking garage structural system was extensively repaired in 2004 & 2005 and the office tower floors 1, 2, 3, 4, 5, 6, 7, 10, 11, 12 and 17 have been extensively renovated since 1994.

o   Site improvements and the buildings are generally in good condition and appear to receive average maintenance. The building is approximately 32-years old and major equipment and building system replacement is anticipated during the evaluation period. Capital reserve items consist of predictable or cyclical replacement type items.

o   Foundations— The foundation system is a concrete slab on grade with building loads supported by concrete footings. Even though the foundation could not be directly observed, _no apparent signs of significant structural distress were observed in the architectural finishes supported by the foundations._

o   Superstructure—The office tower is a structural steel frame with structural steel beams and columns supporting precast concrete flat planks. The penthouse structural is a metal deck supported by steel bar joists, steel beams and columns. The garage structure is precast concrete double tee's, inverted beams, concrete columns with haunches, and perimeter concrete vehicular restraining walls with tendon restraint cables. _No apparent signs of structural distress were observed of the structural or architectural elements of the building tower._ See Garage section for comments.

o   *Exterior Walls—The exterior of the building consists of painted pre-cast concrete double tee walls and single-pane glass with solar film set in aluminum frames. The exterior wall assemblies appeared to be in good condition. Painting of the exterior walls and caulking of openings will be required during the evaluation period. A cost is included in the Replacement Reserve Cost Estimate.*

o   *Windows/Doors—The building windows consist of single-pane glass with solar film set in aluminum frames. Single-pane automatic sliding doors provide access to the tower from the garage. There is a manual operated revolving glass door at the main building lobby With the exception of the deteriorated solar screen window film, the doors and windows appeared to be in good condition requiring routine maintenance during the evaluation period.*

   *(Emphasis was added to all underlined and highlighted areas)*

   S Parker Response: (1) She is in the process of drafting response to D. Axelson's January 14, 2009 letter (response never received);(2) Safeco still in process of reviewing January 15, 2009 corner crack issue letter re: "some concerns with the hollow core panels" (Attachment 01.15.09E). *Comment:* This is the first notice that Medistar receives that Safeco or its consultants also have concerns regarding the structural integrity of the hollow core panels.

**January 20, 2009**   S. Parker sends (1) tentative agenda for January 22, 2009 meeting (2) WJE letter dated January 15, 2009 and (3) Reservation of Rights Letter (Attachment 01.20.09A).

**January 21, 2009**   According to S. Parker, she met with her consultants, Nelson and WJE together for the first time the evening of January 21, 2009, so that their reports would not be biased.

**January 22, 2009**   Meeting at Medistar with Safeco and its engineering consultants to discuss various engineering aspects of the claim.

   *Comment:* Only minutes prior to this meeting, Sandy Parker met with Mr. Hourani and admitted to him that NAE's report was wrong, because as she described it, NAE personnel misinterpreted the CAD survey data which NAE had received from their surveyor on this project, GBI.

   This meeting lasted over five hours with much debate (at times, heated) regarding inspection and testing procedures, repair methodologies, etc.

   Key points included the following:

- Nelson stated that once the GBI survey data is input correctly, it will "smooth the curve" referring to the fact that the out-of-plumbness calculations will be approximately "cut in half." Mr. Hourani did not approve of Nelson's generalities and requested specifics regarding how such error was made. Sufficient answers were not received.

- Much debate was held regarding WJE's proposed methodology to brace the loose, insufficient plywood board up to the loose panels that WJE acknowledged as being structurally compromised per their January 15, 2009 letter.

- I personally discussed WJE's January 15, 2009 letter (Attachment 01.15.09A) which stated that "When we identified these cracks from our survey drops on the exterior of the building, *we recommended* that materials on the interior of the building at these cracks be removed to better determine the severity of the cracks (emphasis added." I asked WJE and S. Parker to whom WJE made this recommendation, because it clearly was not made to Medistar. Since the hurricane hit, Medistar has wanted a thorough investigation and would have cooperated fully with WJE to perform this work in order to determine the true extent of the damages. S. Parker stated that she would have to discuss this issue with S. Davidson, and further implied that she felt that it was beyond the scope of investigation that Safeco was required to perform.

- From Ms. Parker's comments above, it became clear that Safeco had no intention of fully investigating the interior panel cracks. Therefore, after Safeco and their representatives left the meeting, M. Hourani met with L. Vaile, P. Voivedich and D. Axelson and ordered P. Voivedich to have Paladin personnel remove the interior sheetrock in select areas to determine whether or not interior panel cracks existed. Based on his experience and belief that the hurricane winds caused torsion of the building, Mr. Hourani stated that we would find panel cracks at 45 degree angles at the connections to the floor slabs. Once the sheetrock started being removed, this is precisely what was discovered.

See Executive Summary and Comments prepared by D. Axelson at Attachment 01.22.09A.

**January 23, 2009**   D. Axelson requests electronic copies of EFI photos per Gary Boyd's request (never received). See Attachment 01.23.09 A.

**January 26, 2009**   D. Axelson requests written confirmation of 30-day abatement that SP verbally agreed to during the January 22, 2009 meeting. See Attachment 01.26.09 A.

S Parker Response: She states that she will respond regarding abatements later in the week or early next week (no response received). See Attachment 01.26.09 A.

| January 27, 2009 | Apollo BBC issues report prepared for NAE regarding structural condition of building. See Attachment 01.27.09 A. |
|---|---|
| | See timeline at February 24, 2009 for further comments. |
| **January 28, 2009** | WJE issues letter "rescinding" their plywood board up design. S. Parker forwards to S. Davidson. See Attachment 01.28.09 A. |

**January 28, 2009**

WJE issues letter "rescinding" their plywood board up design. S. Parker forwards to S. Davidson. See Attachment 01.28.09 A.

**Excerpt:**
"None of the information included in these calculation or sketches should be used for any upgrades or repairs to the temporary plywood window covering or for any other purpose. We ask that all of the documents listed above be immediately returned to WJE."

Gary Boyd issues "Interim Engineering Report, Number Two" which states that WJE has no right to rescind drawings. See Attachment 01.28.09 B

**Excerpt:**
"Please know that only Mr. Hopmann, the Engineer of Record for the subject documents, can address corrections to his signed and sealed calculations and/or sketches. Mr. Hopmann can re-issue with revision(s) if he considers it appropriate; but no one, not even Mr. Hopmann, can "*rescind*" the previously-issued engineering documents."

S. Parker requests permission for four glass subcontractors to have access to the building to give estimates for repairs. See Attachment 01.28.09 C.

S. Parker forwards WJE (1) Glazing Repair Elevations, (2) Typical Building Dimensions, and (3) Glass Quantities Letter. See Attachment 01.28.09 D.

**January 29, 2009**

D. Axelson emails brief letter re: WJE rescinding drawings and forwards to Safeco Gary Boyd's "Interim Engineering Report, Number Two" which states that WJE has no right to rescind drawings. See Attachment 01.29.09 A.

WJE issues letter, "Notification of Distressed Conditions," detailing Safeco concerns with the building. This letter was received by Medistar on February 2, 2009. See Attachment 01.29.09B.
Note: Medistar's response to WJE's "Notification of Distressed Conditions" was issued on February 12, 2009 and can be found at Attachment 02.12.09A.

**January 30, 2009**

M. Hourani issues letter to S. Parker re: WJE rescinding drawings and also addresses the WJE January 15, 2009 letter regarding cracked panels. See Attachment 01.30.09 A.

*As this letter addresses many of the engineering issues related to this claim, the entire body of this letter is excerpted below:*

We are in receipt of WJE's letter to you dated January 28, 2009 (see Attachment A) which serves as Formal Notification that WJE is rescinding the "Plywood Covering Temporary Repair calculations dated December 17, 2008, stamped January 5, 2009 and sketches dated December 19, 2008 with revisions dated January 4, 2009." In response to this letter, our structural consultant, Gary W. Boyd, P.E., has informed us in writing that WJE does not have the right to rescind their stamped drawings or calculations. See report from Gary W. Boyd dated January 28, 2009 regarding this issue (Attachment B).

It is curious that WJE wishes to rescind their drawings and calculations when, on December 24, 2008, Dale Fuhr, Associate Principal of WJE, stated that "WJE stands behind the design provided to properly secure the plywood in accordance with the current wind pressures included in the code" (see e-mail attached at Attachment C). Does WJE now acknowledge that based on damage observed to the precast panels that such a methodology is inappropriate? If so, we would agree with such a conclusion. We do agree fully with WJE's statement that "None of the information included in these calculations or sketches should be used for any upgrades or repairs to the temporary plywood covering or for any other purpose." You can be assured that neither Medistar nor their consultants will use these drawings as the basis for any repair work, especially since many concerns and questions raised about WJE's solution have not been satisfactorily answered.

Based on their letter to Sandy Parker and Scott Andersen dated January 15, 2009, WJE clearly is aware of the 45 degree cracks to the interior side of the hollow core panels which occur at the anchor points to the floor slab. WJE noted that one of these panel cracks was located on the 9th floor and the remaining 4 cracks (one on each corner of the building) were observed by WJE on the 13th floor. WJE's report further mentioned that these interior cracks need further evaluation, and states in the 3rd sentence of paragraph 2, that "Of these 5 locations, 4 correspond to exterior cracks at the same location, thus potentially making them through-wall thickness cracks."

WJE was concerned enough about the cracked precast panels to suggest that "perhaps even temporary support for these panels can be provided until final repair details can be designed and installed." From this statement, we assume that Dale Fuhr has changed his position regarding the safety concerns related to the panels since he stated on December 24, 2008 that "We have

evaluated the west, south and east elevations and have not yet observed any indication that the building panels have experienced any damage caused by Hurricane Ike or any other weather event. WJE feels that the continued claims by the owner or his agents that the building might be, or is unsafe is greatly overstated." On the contrary, it is our understanding from the meeting and statements made by Mark Hopmann, P.E., that WJE believes that the following areas represent current safety issues:

    (1) The exterior crack on the parapet wall
    (2) The interior cracks on the precast panels on the 13th floor (one crack in particular)
    (3) The risk that glass could detach from the window frames behind the temporary board up and fall from the building
    (4) The risk to the tenant in the 4th floor suite which currently has boarded up windows

Based on these concerns addressed by Mr. Hopmann, it does not seem that the Owner's concerns are "greatly overstated."

During the meeting, both Gary Boyd and I repeatedly asked Mr. Dale Fuhr and Mr. Mark Hopmann the following question, "How can WJE propose strapping the plywood board up by drilling into precast panels while, at the same time, WJE acknowledges that these panels are compromised and in need of bracing? (emphasis added)." As an engineer, I questioned how WJE could ask us to rely on a temporary repair of the plywood which supports major glass windows and connects to cracked precast panels which also need to be supported. Also, Gary Boyd, P.E., asked the same question because we simply cannot perform any type of repair that may bring the windows or precast panels down, potentially injuring or killing someone. How can we rely on attaching a weakened and falling structure to another weakened structure? This was a very valid question because we care about the safety of others. Unfortunately, our question still remains unanswered.

Please note that the January 22 meeting was attended by four Professional Engineers (Dr. Erik Nelson, Gary W. Boyd, Mark Hopmann, and me) as well as other individuals with construction and/or engineering expertise. During the meeting, we discussed at length various methodologies to secure the board up. However, based on known and possible unknown structural deficiencies (of the hollow core panels, in particular, and the building, in general), neither I, Medistar's engineering experts, nor Safeco's engineering consultants have been able to develop any methodology that can be employed to temporarily secure the plywood board up in a safe manner (emphasis added). Is there any viable solution proposed by WJE, Nelson Engineering or any other properly licensed engineer

to secure the board up which was installed incorrectly by ACT Catastrophe? We know of none.

Furthermore, we object to the statement by Dale Fuhr on December 24, 2008 that "If the owner or other parties wish to ignor (sic) these recommendations, the responsibility and liability for future damage to the building, tenants, public or property owned by others become theirs." Mr. Fuhr further states in his January 28, 2009 letter to you that "the Owner of the building should immediately retain an engineer licensed in the State of Texas to review the original installation of the plywood and provide repair recommendations as required to meet the current City of Houston building codes." We are not responsible for correcting the insufficient board up performed by ACT Catastrophe or for accepting any liability related to this issue. Safeco recommended that this contractor be used on the project, Safeco representatives were present during the installation, and Safeco compensated ACT Catastrophe directly for this deficient repair. Dale Fuhr himself acknowledges this deficient repair when he states that "It is certainloy (sic) apparent to any engineer that the thickness and attachment method originally used does not and will not meet the code requirements." Safeco further acknowledged responsibility for this safety issue by retaining WJE to develop a methodology to secure the board up. The fact that I do not concur with WJE's methodology (and am precluded from concurring on the basis of ethical standards of professional engineers) does not entitle Safeco to disclaim any responsibility or liability related to this issue (emphasis added).

I must reiterate that the safety of tenants and guests (and the public at large) is our primary concern. Our concerns about the building being unsafe are sincere. They are not "greatly overstated" or "gamesmanship" as suggested by Mr. Fuhr. Taking risks with the lives and safety of people is never a game.

We anxiously await both your response regarding the above issue as well as completion of WJE's comprehensive report which was promised on January 22, 2008 to be issued on Monday, January 26, 2008. We can no longer wait on all these delays by Safeco and their consultants. It has been almost five months since Hurricane Ike hit our building. We need concrete solutions to resolve these issues as well as an offer from Safeco to return the building to its pre-loss condition. We need to resolve these issues quickly in order to keep whatever tenants remain and fulfill our duties to these tenants as the Owner of this property."

**February 2, 2009**   D. Axelson email to S. Parker regarding delays in NAE and WJE reports and access to building by glass contractors. See Attachment 02.02.09 A.

S. Parker Response: Ms. Parker replies that Dr. Nelson needs 7-10 working days to revise report and that WJE needs Nelson's revised report before they can complete their report. See Attachment 02.02.09 A. *Comment:* What about S. Parker's statement that she wants the engineering reports to be unbiased?

Sandy Parker forwards GBI survey data to Medistar (Attachment 02.02.09B).

S. Parker forwards certified copy of insurance policy.

S. Parker (1) sends WJE's letter, "Notification of Distressed Conditions" and (2) responds to January 29, 2009 letter from Medistar by stating that WJE rescinded their plywood board up drawings because M. Hourani wouldn't accept them. See Attachment 02.02.09 C.
Note: Medistar's response to WJE's "Notification of Distressed Conditions" was issued on February 12, 2009 and can be found at Attachment 02.12.09A.

**February 4, 2009**   S. Parker emailed that she spoke with L. Karkabi who indicated that Medistar wanted WJE removed from the job. See Attachment 02.04.09 A.

NAE issues revised structural report, "Hurricane Distress Analysis IV". S. Parker sends report to Medistar. See Attachment 02.04.09 B. *Comment:* NAE issued Hurricane Distress Analysis IV because of admitted errors regarding the interpretation of the GBI survey data. Therefore, the survey results shown in the original report, Hurricane Distress Analysis III, were materially incorrect. Medistar attempted to obtain information regarding the GBI survey from Safeco, NAE and GBI. However, GBI would not provide the requested information to NAE, the firm for which they produced the work product in question. In addition, S. Davidson requests permission from S. Parker for Medistar to contact GBI directly. S. Parker refuses due to confidentiality.

See separate timeline of events (and supporting documents) with regard to GBI following this timeline.

M. Hourani issued a response to NAE's Hurricane Distress Analysis IV. See Attachment 02.04.09C.
*The entire body of Mr. Hourani's response is excerpted below. The text of NAE's report is shown in black and Medistar's comments are shown in red.*

# HURRICANE DISTRESS ANALYSIS IV

## SCOPE, PURPOSE AND INTRODUCTION

This report was prepared to clarify the survey data presented in Nelson Architectural Engineers, Inc.'s (NAE) *Hurricane Distress Analysis III* report, dated December 1, 2008. In our *Hurricane Distress Analysis III* report, we referenced survey data for the office building prepared by GBI Partners, L.P. (GBI). At the time of our writing, the survey data was provided to us in an AutoCAD file and it was NAE's understanding that the data was taken at a single vertical line at the re-entrant corners of the building. Upon further clarification with GBI, it was communicated to NAE that the survey data was actually taken at the two exterior corners of the re-entrant corner (underline added). Why did Dr. Nelson not communicate and clarify the GBI information when he received it over three months ago? Dr. Nelson's mistake has caused us tremendous delays, tremendous losses, tremendous agony concerning the safety of people, tremendous costs for additional engineering from our consultant, Gary Boyd, and also tremendous confusion. NAE's new report is below mediocrity, is incorrect. Simply stated, NAE's new report is an insult over an injury. At the time of this writing, a signed and sealed copy of the GBI survey data has been provided to NAE and is included in the **Illustrations section** of this report and is discussed herein. Also discussed is the basis for the weather data presented in our previous reports.Regarding the GBI survey data, we are still confused regarding what NAE is trying to say and we strongly feel we are not getting a straight answer. It is starting to be obvious that NAE chose not to understand their surveyor, GBI, or that NAE "clarified" with GBI their incorrect assumptions and conclusions. NAE received the survey information from GBI in October 2008. NAE incorporated the GBI survey data in their first report on the Twelve Oaks building disaster, Hurricane Distress Analysis III, dated December 1, 2008.

On December 22, 2008, Gary Boyd, P.E., President of Boyd Engineering Inc., our engineering consultant, and I met with Dr. Eric Nelson, P.E., at the insured property. We asked Dr. Nelson a number of questions regarding the survey data to which Dr. Nelson had no answers. Dr. Nelson stated that he would have to speak with GBI to obtain clarifications which he would then communicate to us. We never received a response.

During the meeting on January 22, 2009 at Medistar, Gary Boyd and I proved to Dr. Nelson that his calculations and survey did not match the conclusions, diagrams and graphs that were included in NAE's December 1, 2008 report. Dr. Nelson acknowledged mistakes and said he will "smooth" the curvature and deflection lines after meeting with his surveyor, GBI, for clarification. At this meeting, Gary Boyd and I requested the *original* survey information on which NAE based their findings and conclusions. Dr. Nelson promised to provide this information, but it has not yet been provided to us for our review.

We received NAE's corrected report on the building (this report), Hurricane Distress Analysis IV, dated February 4, 2009. This revised report is worse than the first incorrect report due to its ambiguity. Please look at the statement above that "Upon further clarification with GBI, it was communicated to NAE that the survey data was actually taken at the two exterior corners of the re-entrant corner."

It appears that Dr. Nelson manipulated the survey results provided by GBI for his and Safeco's advantage by changing the numbers provided by GBI and forcing GBI to use wrong assumptions. Also, he intentionally tried to confuse the survey data by forcing the two vertical lines of survey data taken at the" re-entrant corners" of the building into a single line of data for each corner of the building.

## RECEIVED INFORMATION

In addition to on-site observations, What on-site observations? What did NAE perform during its on-site observations, because NAE states later in this report that it was a limited site observation? Did NAE go back to the site after Dr. Nelson admitted his mistake in the December 22, 2008 meeting? Did Dr. Nelson or any of the NAE staff go back physically to the site to fully evaluate their previous miscalculations and mistake and conduct due diligence? The opinions presented in this report are based on the following information received by our office:

*Survey data prepared by GBI Partners, L.P. (Eugene R. Baker, Professional Land Surveyor) dated January 28, 2009.* We have received the survey data dated January 28, 2009. However, we requested a copy of the initial survey information provided by GBI to Nelson on which NAE based their December 1, 2008 report.

This survey information has not been received. We request an immediate meeting (see previous comments) to discuss the survey information and the clarification of the NAE report.

*Code provisions with effective date provided by the City of Houston on February 2, 2009.*

## WEATHER DATA

The weather data presented in our previous reports was prepared by the CompuWeather, Inc. (CompuWeather). The meteorologists at CompuWeather complete extensive research and analysis of the available and relevant weather data in order to provide an accurate report of the conditions experienced at or around a specified location. CompuWeather only uses weather data from reliable sources What reliable sources?; this ensures that the weather collecting equipment is properly installed, maintained, and calibrated. Typical sources utilized by CompuWeather include the: National Oceanic & Atmospheric Administration, National Weather Service, National Hurricane Center, National Data Buoy Center, National Ocean Service, and Storm Prediction Center.

NAE obtained site-specific weather information from CompuWeather, which includes a timeline of the maximum sustained wind speeds, wind gusts, and wind direction during the storm event. The site-specific weather data is included in the **Appendix** section of this report. Based on a review of the available weather data, the maximum sustained wind speed at the site during the storm was 66 mph (underline added – data is inaccurate) and recorded coming from the north-northwest and west-northwest directions during the early morning hours of September 13, 2008. Additionally, the maximum 3-second wind gust was 88 mph (underline added – data is inaccurate) from the north-northwest direction during the 5 a.m. hour on September 13, 2008, which generally coincided with the timeline of the maximum-sustained wind speeds.

## BUILDING CODES AND INITIAL BASE SHEAR COMPARISON

At the time of this writing, it has been communicated to NAE that the subject structure was construction in approximately 1973. Based on the information received from the City of Houston, the 1970 Uniform Building Code (UBC) was utilized to assess the likely design wind speed. The 1970 UBC utilized wind pressures to analyze/design a structure. Currently the ASCE-7 utilizes wind

velocities to analyze/design a structure. In order to compare the 1970 requirements to actual wind load experienced at the subject structure and current standards, <u>NAE calculated the resulting base shear. The resulting analysis indicates that the structure should have been designed for a base sheer more than two times greater than the actual wind speed</u> (underline added)(three-second gust of 88 mph) pressures resulting from Hurricane Ike. This also supports the deflections of the structure to have been in the elastic range (no permanent deformation).

The above discussion should not be construed as a lateral analysis of the building. If it is not lateral analysis, what did NAE base its study on? In order to analyze the load-deflection relationship of the structure, a complete set of building plans would be required; these have been requested but have not been received to date.

Above, the report states, "...NAE calculated the resulting base shear. The resulting analysis indicates that the structure should have been designed for a base sheer more than two times greater than the actual wind speed (three-second gust of 88 mph) pressures resulting from Hurricane Ike." Then in a subsequent sentence, NAE states, "The above discussion should not be construed as a lateral analysis of the building."

My question is the following: If NAE does not have the structural plans that show the framing, steel columns, steel bracing, etc., how can NAE or how did NAE calculate the "resulting base shear?" How does NAE know that the building was designed for a base shear "more than two times greater than the actual wind speed" which NAE stated as 88mph times 2 = 176 MPH?

This is simply wrong, because NAE admitted to having no building plans. These statements are not correct and contradict any engineering principles. If Dr. Nelson had the plans, structural drawings, and specifications and also had the right wind speeds and wind gusts (the 66 mph is erroneous), then NAE would have engineering calculations. I am asking now for Safeco and NAE to kindly send me the calculations from when "NAE calculated the resulting base shear" as you stated. <u>I need to see the structural calculations, wind analysis, and numbers. Please send it to me as soon as possible, so that I may check it.</u>

## REVIEW OF GBI PARTNERS, L.P. SURVEY

At NAE's direction, GBI Partners, L.P. (GBI) surveyed the office building structure in October, 2008. As signed and sealed copy of

the GBI survey data has been provided to NAE and is included in the **Illustrations section** of this report. Further, NAE created an illustration for graphical purposes based on the GBI 3D AutoCAD file and is referred to as **SE-1 in the Illustrations** section of this report. The data at the corners of the structure are presented in x, y, and z coordinates. The x coordinate represents the east-west direction, the y coordinate represents the north-south direction, and the z coordinate represents the height of the structure. **Table 1** below summarizes the out-of-plumbness relative to "level 1."

Table 1. Summary of GBI data

| | Northwest | | | | Northeast | | | |
|---|---|---|---|---|---|---|---|---|
| | x | y | x | y | x | y | x | y |
| Level 5 | 1.2 | 2.4 | 3.6 | 2.4 | 0 | 2.4 | 0 | 2.4 |
| Level 4 | 0 | 1.2 | 0 | 1.2 | 0 | 2.4 | -1.2 | 1.2 |
| Level 3 | 0 | 1.2 | 1.2 | 0 | 0 | 1.2 | -1.2 | 0 |
| Level 2 | 0 | 0 | 1.2 | 0 | 1.2 | 1.2 | -1.2 | 1.2 |
| Level 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Southwest | | | | Southeast | | | |
| | x | y | x | y | x | y | x | y |
| Level 5 | 0 | 1.2 | 0 | 2.4 | -1.2 | 1.2 | 0 | 1.2 |
| Level 4 | 0 | 1.2 | 2.4 | 4.8 | -1.2 | 0 | 0 | 1.2 |
| Level 3 | 0 | 1.2 | 2.4 | 4.8 | 0 | 0 | 0 | 1.2 |
| Level 2 | 0 | 1.2 | 2.4 | 3.6 | -1.2 | 1.2 | 0 | 1.2 |
| Level 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

It should be noted that the survey data points were not measured on the steel frame, but on the precast panels. How can NAE calculate and define deflection of the steel frame if NAE based its study only on the concrete panels? This is an erroneous and unbelievable engineering statement that is not according to standard engineering practice. How can NAE state that the steel frame did not deflect while, in the same report, NAE also says, "It should be noted that the survey data points were not measured on the steel frame, but on the precast panels."

The precast panels are cracked and failing, and according to Dale Fuhr with WJE (_not_ a registered Professional Engineer), the precast panels need to be braced. See WJE letter to Sandy Parker and Scott Andersen dated January 15, 2009 regarding the "Exterior Wall Panel Corner Crack Issue" as well as the WJE letter to Sandy Parker dated January 29, 2009 regarding "Notification Letter of Distressed Conditions." Why are both of Safeco's engineers and consultants contradicting each other's facts and conclusions? On one side, WJE is stating that the panels need to be braced. On the other side, NAE is stating that the frame did not deflect based on

their survey of the concrete panels (panels that are also in question, and both of Safeco's consultants, NAE and WJE, are in conflict).Two data points were taken at each corner as a result of the re-entrant corner created by the precast panels. The data was taken at five different levels; at the top and bottom, at the mid-height, and at the two quarter points ("level 1" to "level 5"). The data was not related to a specific floor of the structure. A total of 80 data points (x any y coordinates only) were taken as a result of the two data points at each corner at five levels. Further, the data was reported by GBI in .1' (1.2") increments. For reference purposes, when analyzing the data offsets to the north and east were considered to be positive values.

At the re-entrant corner, data points were taken on the face and edge of the precast panels; the face being the outer portion of the panel and the edge being the shorter portion of the interior of the re-entrant corner. The data could vary depending on whether it was taken on the face or the edge as the result of possible paint, caulk, conduit, finishes, etc., the variations, which could result in deviations between the two data points at the same re-entrant corner.

This report is erroneous for the following reasons:

1) NAE did not base it on the steel frame construction and design.

2) NAE did not have the original or a copy of the plans and drawings.

3) How can NAE report its opinion on the deflection of the steel structure when NAE's study was based, not on the steel, but on the concrete panels?

4) Why, after the December 22, 2008 meeting when Dr. Nelson was first informed of his mistake, did he not immediately call his surveyor, GBI, and correct his mistake instead of giving us another incorrect report which we received on February 6, 2009?

5) In the last meeting held on January 22, 2009, Dr. Nelson stated that the building deflected, but that it "came back." How does Dr. Nelson know how many inches it deflected and how many inches it "came back?"

**Top of Building**: Based on a review of the GBI survey data, a maximum difference measured between the top and bottom of the office building in the east-west direction was 3.6" towards the east at the northwest corner. The maximum difference measured between the top and bottom of the office building in the north-south direction was 2.4" to the north at the northeast, northwest, and southwest corners. The average difference measured from the top of the office building relative to the bottom was approximately ½" and 2", in the east-west and north-south directions, respectively.

At the top of the structure, the data in the north-south direction ranged from 1.2" to 2.4" to the north, which is L/2350 to L/1175 in magnitude and in the opposite direction of the predominant winds. The data at the top of the building in east-west direction ranged from -1.2" to 3.6". The data at "level 5" indicated no out-of-plumbness, in the east-west direction at the northeast or southwest corners. Dr. Nelson's statements above are very confusing and not accepted. We need to review GBI's original data.

At various re-entrant corners, the two data points did not correspond to each other. For example, at the northwest corner at the second "level" of data (not the second floor, see GBI illustration), the north exterior corner indicates a difference of 1.2" to the east and no out-of-plumbness in the north-south direction and the west corner indicates no out-of-plumbness in either direction. Therefore, at approximately the same location in the building, data can vary depending on which element was surveyed.

The data indicate that only four data points indicate an offset greater thank 2.4", which were located at "levels" 2 through 4 at the southwest corner and at "level 5" at the northwest corner. Further, at these four data points, the data at the corresponding re-entrant corner conflicted and in all cases was offset by 1.2". Also, note at these locations all of the points correspond to panel edges in lieu of panel faces. NAE's explanation is very confusing and not accepted. Please see previous comments.

Further, the data do not indicate a progression of out-of-plumbness. The data indicate that the largest deviation of the out-of-plumbness occurred at the bottom quarter of the structure between "level 1" and "level 2" of 3.6" in the north-south direction at the southwest corner; however the corresponding corner conflicts with an offset of 1.2".

All of NAE's report regarding the deflection is rejected, because the analysis is based on a survey of the concrete panels and not a

survey of the steel frame in question. Also the explanations above are not easily understandable. Therefore, the Owner will not agree with your incomplete and incorrect theories and numbers.

Upon further review of the GBI survey data (What is meant by further review of the GBI survey data? We need GBI and NAE to explain the survey data, field work procedures, and all previous changes and clarifications.), it is still NAE's opinion that there is no pattern of out-of-plumbness in the data to indicate significant deflection of the structure due to lateral loads. If the structure were "racked" as a result of Hurricane Ike, a general trend in all of the data would be expected along with significant distress (underline added). Yes, there is significant distress, because some of the concrete precast panels are cracked and failing. The lack of consistency between the two data points at the same corner, as well as the lack of progression of deflection (no bending pattern and no twisting effect) indicates that the structure was not deflected due to lateral loads. Further, the distress patterns at the glass curtain wall were not consistent with lateral movement of the frame, but rather localized suction pressures. Additionally, a limited external review of the precast panel did not reveal any significant distress (underline added). This is solid proof of NAE's incompetence and lack of good analysis and correct physical inspection. NAE stated that the precast panels did not reveal any significant distress – just look at the pictures of these cracked and failing panels that are extremely dangerous to the lives and safety of people. How can a registered Professional Engineer like Dr. Nelson make this unprofessional statement? This raises another very valid question. How many times did Dr. Nelson inspect the building properly for structural stresses, especially since I told him myself that the corners of the building went into severe stress and deflection that induced tremendous stress in the concrete panels, mullions, and sheetrock around these corners?

The statement by NAE regarding no "significant distress" to the panels borders on misrepresentation and complete negligence that can negatively affect the lives and safety of people. We have unquestionable proof that Dr Nelson was aware of the poor condition of the panels *before* he issued his "revised report." Dr. Nelson was present during the entire meeting at Medistar's offices on January 22, 2009. It was during this meeting that Mark Hopmann, P.E. with WJE, discussed several safety concerns, including the need to brace the panels. Dr. Nelson himself participated in discussions regarding alternative methodologies to brace the panels. After such a discussion, we do not know how Dr. Nelson in good conscience could issue his "revised report" on

February 4, 2009 (13 days *after* the January 22, 2009 meeting). We do not know what type of error and omissions insurance NAE has to cover this faulty and unprofessional report. (it is our understanding that Wiss, Janney, Elstner Associates, Inc. is performing a more detailed evaluation of the precast panels). **Therefore, NAE's is of the opinion that the structure has not permanently "racked" as a result of Hurricane Ike.**

NAE maintains its opinion that the offsets are minimal and likely construction related. Numerous variances are introduced through fabrication and construction of a building that can influence the apparent plumbness (or out-of-alignment) of the structural framing. Such variances may have been introduced through fabrication of the steel members, erection of the steel frame, fabrication of the precast concrete panels, and execution of the connection (erection) between the precast panels and the steel frame. Now NAE blames this deflection on the fabrication and construction of the building which occurred in 1973. NAE was not even in existence at this time. They did not inspect the fabrication and construction in 1973. This concludes that the NAE report is not worth anything.

## AISC DISCUSSION

For comparison and as a guide, the Seventh Edition of the Manual of Steel Construction prepared by the American Institute of Steel Construction (AISC) was reviewed. In regards to steel buildings, Section 7.h.2 states:

*In the erection of multi-story buildings individual pieces are considered plumb, level and aligned if the error does not exceed $1 \cdot 500$, provided that:*

*(2)The displacement of the center-line of the exterior columns from the established column line, is no more than 1 inch toward, nor 2 inches away from, the building line at any point in the first 20 stories. Above this level these limits may be increased by 1/16 inch for each additional story, but may not exceed a total displacement of 2 inches toward, nor 3 inches away from, the building line.* This information as given to Dr. Nelson during the December 22, 2008 meeting at the building. In addition, Gary Boyd included this information on Page 4 of his "Interim Engineering Report, Number One," dated January 14, 2009 which was immediately provided to Safeco after issuance. This AISC information was stated to remind Dr. Nelson that the out-of-plumbness reported in his first report significantly exceeded erection tolerances. This proves that NAE

is quoting what we gave them, but the difference is that NAE's report is still wrong for the second time.

Although the survey data indicates an out-of-plumbness greater than that defined by the AISC, the totality of the out-of-plumbness of the structure as a whole is not taken into consideration. Although the external plumbness measurements should be representative of the steel frame (underline added), In this case, what did NAE base its report on without having the size of steel columns and connections of steel beams to columns? Is it a moment connection, a welded connection, or a bolted connection? How can NAE prepare such an unbelievable report without knowing the steel frame sizes?

As NAE disclosed that it does not have the plans of this building and has no specifications or calculations, how can NAE say that the wind load from Hurricane Ike was less than the wind load that the "structure should have been designed for." In this case, I am asking NAE how it determined the capacity of the structure, if NAE did not have all engineering plans and did not perform adequate inspection of the building.

The first report issued by NAE was wrong. Furthermore, NAE did not know that many of the panels are cracked. We kindly request that Dr. Nelson send us the engineering calculations used to prove his theory as soon as possible. the actual as-built plumbness of the steel columns is unknown at this time. It is possible that the structure was not built within the standard tolerances at the time of construction.

Furthermore, the survey data was taken at the precast panels and was not a direct measurement of the steel framing. If "the survey data was taken at the precast panels and was not a direct measurement of the steel framing" as NAE is stating, how can NAE determine the deflection of the steel framing because NAE can "not see the forest for the trees?" Though the survey data should be representative of the general pattern of plumbness, it is likely that the overall fabrication, construction, and erection of the elements of the structure could affect the apparent out-of-plumbness measured. Based on the GBI survey data, the lack of a pattern of out-of-plumbness, and the reported weather data, the measured out-of-plumbness of the structure is likely related to the actual out-of-plumbness as a result of the erection of the steel frame and/or a compounding of dimensional variances resulting from the fabrication and erection of the building components, including the precast panels. Further time dependent effects

including, but not limited to, shrinkage, creep (Creep is only in concrete, so what is NAE basing its study on?), thermal movements, and settlement may influence the plumbness measurements.

## CONCLUSIONS

Based on further review of the GBI Survey data, site observations, and analysis, it is NAE's opinion that there is no pattern of out-of-plumbness in the data to indicate significant deflection of the structure due to lateral loads. If the structure were "racked" as a result of Hurricane Ike, a general trend in all of the data would be expected along with significant distress (underline added). There is significant distress. Look at the panels and all of the cracks on the entire building surface. The GBI data is not consistent with permanent deformation of the structure; 76 out of 80 data points indicate an offset of 2.4" or less. We need complete explanations regarding all 80 of the data points, because we are confused due to the previous misinterpretation of the GBI survey data by NAE, as well as ongoing questions regarding the survey data used in this revised report. Further, the distress patterns at the glass curtain wall were not consistent with lateral movement of the frame, but rather localized suction pressures. A limited external review of the precast panels did not reveal any significant distress consistent with lateral movement of the structure (underline added.) NAE is repeating the same mistake. See my previous response.

Further, it is our opinion that the wind loads experienced during Hurricane Ike at the subject structure are significantly less (than) what the structure should have been designed for. An analysis of the wind loads indicates that the structure should have been designed for a base shear more than two times greater than the actual wind speed (three-second gust of 88 mph) pressures resulting from Hurricane Ike. This also supports the deflections of the structure to have been in the elastic range (no permanent deformation). **Therefore, NAE's is of the opinion that the structure has not permanently "racked" as a result of Hurricane Ike.** NAE states that the deflection of the structure has been in the elastic range (no permanent deflection.) How much was the elastic range (1 inch, 3 inches, 6 inches, 10 inches)? How did this "elastic range" of the structure come back with no deflection?

## LIMITATIONS

This document is a rendering of a professional service, the essence of which is the provision of advice, judgment, opinion, or professional skill.

The items observed and documented in this report are intended to be representative of the architectural and structural condition at this structure. No attempt has been made to document the condition of each and every structural and nonstructural element (underline added). Only visible items were observed and documented. Unless noted otherwise, destructive testing, i.e., removing gypsum board, veneer, or other finishes for observation of the actual structural-framing members, was not performed (underline added).

IF NAE did not document the condition of the structural and nonstructural elements and only relied on "visible" inspection, after waiting on NAE's report, the question is how is NAE saying that there is no deflection in this narrow and slim building, if NAE did not take into consideration how the entire structure behaved under the hurricane forces that lasted 8 hours?

The entire structure in engineering is comprised of the frame and floor systems that act as a diaphragm, it is the steel beams and column connections, and it is also the behavior of the steel "X" bracing in the building that transferred the loads, stresses and deflection to the columns, floors, concrete panels, glass mullions and other structural elements in order to resist hurricane forces on a very narrow building (8,390 square feet per floor and 17 stories high.) That is why the concrete panels cracked and failed, window walls deflected, and framing mullions are bowed to the outside and too damaged to safely hold glass windows. Just look at the pictures.

NAE admits that inspection of actual structural framing members was not performed. Therefore, this report is completely wrong and rejected. Adding to all of the above, Sandy Parker admitted in the last meeting held on January 22, 2009 with all of the engineers and consultants of both Safeco and the Owner present, that NAE's first report was incorrect. Per Ms. Parker, the error in the Nelson report due to NAE's misinterpretation of the GBI survey data was only discovered on January 21, 2009, the night before the meeting. The reason for this "late discovery" was due to the fact that NAE and WJE (Safeco's consultant reviewing the concrete panels and facia), did not coordinate or even speak to each other which is unbelievably wrong.

Ms. Parker stated that her reason for this lack of communication was that she wanted the reports of NAE and WJE to be independent and unbiased. Ms. Parker stated that the evening of January 21, 2009 was the first time NAE and WJE had discussed their findings. As a registered P.E., I can not understand, believe, or comprehend how or why two engineering and consulting firms hired by Safeco to analyze this building would operate without total coordination. If these consultants don't communicate, how can NAE know about the cracked panels found by WJE during their comprehensive survey of the curtain wall? How can NAE issue their report and conclusions about whether or not the building deflected if they are not aware of WJE's findings? How can WJE state their findings without checking with NAE on the structural resistance of the curtain walls, concrete panels and other elements?

Safeco hired two independent consultants, one for the structural framing (NAE) and one for the curtain walls, glass panels, and concrete panels. Then Safeco instructed both consultants not to coordinate and work together. No wonder we are getting incorrect reports, because the building acts as a unit with its many interconnected components, including the floors, columns, steel frame, concrete panels, glass windows and outside frames. No one can evaluate the structural behavior of the steel framing without knowing the other components.

NAE does not have the structural or architectural plans of the building. The conclusion is that the NAE report is rejected based on erroneous assumptions, not following engineering principles, wrong data until today, and this is the second incorrect report issued by NAE. Also, the report is rejected because it is based only on assumptions without any backup and not even calculations. It is based on a limited visual observation which is wrong for a narrow, 17-story building that experienced severe distress and failure as a result of Hurricane Ike. Also, it is rejected because it contradicts itself without any real engineering principles.

Simply stated, the NAE report is wrong. It was made for the benefit of Safeco and for the purpose of Safeco not having to pay for the actual damages caused by Hurricane Ike. Safeco and its consultants blame the problems on bad construction even though the building has functioned perfectly since 1973. Safeco has used NAE for many projects, and NAE's position is to minimize any insurance settlement and blame all damages on pre-existing conditions or bad construction.

NAE and Dr. Nelson are committing a grave mistake by not telling the truth, misrepresenting the facts, and not performing real due diligence as is required for any registered Professional Engineer. Also, NAE has endangered people's lives without any real consideration to their value and thereby violated the code of ethics of Professional Engineers of the state of Texas.

Also, NAE states on Page 7 of their revised report that "...destructive testing, i.e., removing gypsum board, veneer, or other finishes for observation of the actual structural-framing members, was not performed." In this case, how can NAE reach its erroneous conclusions without taking off all the covering, exposing the steel structure, and surveying it properly according to good engineering practice? This is what I have been asking Safeco to do since Day One, and now 5 months after the hurricane disaster, still Safeco and their consultants ignore our recommendation. Safeco and their consultants (WJE, in particular) would not accept our recommendation and appear to have advised Safeco against performing this type of study. We are finding that WJE is one of the causes of major problems and delays on this project. WJE is just another consultant of Safeco who has the same goal as the others: to blame everything on pre-existing conditions.

This report was prepared in order to document distress observed in the structure. <u>The opinions presented herein are based on site observation, field information</u> (underline added) Site observation and field information show a lot of distress to the panels, sheetrock, steel bracing, and other components.) and measurements taken, written and verbal information, and experience and structural analysis, where applicable. <u>No complete review of this structure's conformance to current or previously applicable building codes was performed (underline added)</u> So how do you know the building? However, specific items that may be at issue with the applicable building code requirements may be noted.

This report should not be construed as an assessment of total damages to the structure as the time of site observation. In addition to the observed and documented items of distress, <u>hidden defects may exist</u> (underline added) that were not readily visible. Also, some damaged areas may have been previously repaired and, unless otherwise noted, were not visible at the time of observation. However, these areas may experience future distress. No representation, guarantee, or warranty as to the future performance of this structure is made, intended, or implied.

This report has been prepared as a basis for an opinion of probable construction cost of repair and for the purpose of evaluating an alleged claim. Additional construction documents prepared by a Design Professional may be required and are beyond the scope of this assignment.

In the event that additional information becomes available that could affect the conclusions reached in this investigation, this office reserves the right to review, and, if required, change some or all of the opinions presented herein.

This report has been prepared for exclusive use of the client and their representatives. No unauthorized re-use or reproduction of this report, in part or whole, shall be permitted without prior written consent.

This report is a questionable and unreliable report for many reasons previously discussed. Dr. Nelson owes us (as owner of the building), owes Safeco (as his client), and owes his profession (as a registered professional engineer) the responsibility of explaining his report in detail and explaining his conclusions based on the GBI survey data.

See Haynes Whaley report addressing NAE's "Hurricane Distress Analysis IV" at Attachment 03.24.09 A.

**February 6, 2009**   D. Axelson requests all draft WJE reports. See Attachment 02.06.09A.
**Excerpt:**
"As you are aware, Mr. Hourani was frustrated at the last meeting because of some of the opinions expressed by other engineers and consultants which were inaccurate. We very much want to get to an honest opinion based on the analysis of everyone involved. We assume you want the same thing as well.

We have received the corrected GBI survey data as well as Dr. Nelson's revised report. Thank you for providing these documents. As soon as possible, could you please send us *all draft reports* Safeco has received from WJE related to this project? (emphasis added) Also, please advise us when we should expect to receive WJE's final report regarding their comprehensive survey of the building." See Attachment 02.06.09A.

S. Parker refuses to provide drafts to Medistar. See Attachment 02.06.09A.
**Excerpt:**
"WJE is working on their final report as I write this response. As soon as it is available for review I will forward to you as I have in the past. In regards to your request for ALL DRAFT REPORTS, I have forwarded

you all information received to date from our experts and if there were any Draft Reports they are part of our file and are not released to insured's (emphasis added)." See Attachment 02.06.09A.

**February 10, 2009**  S. Parker sends another Reservation of Rights Letter and revised document request list (Attachment 02.10.09A).

S. Parker forwards email from S. Andersen apologizing for not getting access issues resolved re: inspection of cables within precast wall panels in board up areas (Attachment 02.10.09B).

**February 11, 2009**  S. Parker asks D. Axelson who F. Patout is. D. Axelson responds. See Attachment 02.11.09 A.

McIntare and Associates (representing Medistar) issues roof report. See Attachment 02.11.09 B.

**February 12, 2009**  M. Hourani issues letter to S. Parker re: WJE "Notification of Distressed Conditions." See Attachment 02.12.09 A.

*The entire body of this letter is excerpted below. The text of WJE's original letter is shown in black and Medistar's comments are shown in red.*

"This letter will serve as notification that during our recent building evaluation, conditions with distressed materials were observed that need timely remediation. We feel these conditions must be brought to the attention of the property owner.

"Timely remediation"? Regarding the plywood board up, ACT Catastrophe, Safeco's recommended contractor, boarded up the windows inappropriately shortly after the hurricane. Then Safeco directed WJE to design a solution to the plywood board up. After a lengthy wait, WJE issued their drawings and specifications which Dale Fuhr "stands behind" (see e-mail from Dale Fuhr dated December 24, 2008 at Attachment A.) However, when we received these design documents, they were not sealed by a licensed engineer. When we finally received sealed drawings on January 6, 2009 (see Attachment B), we discovered that WJE's solution was incorrect and dangerous, because WJE proposed reinforcing the plywood board up off of the hollow-core panels which are damaged and can not support the reinforcement. Furthermore, due to the danger involved in executing WJE's proposed design, most contractors would not even consider bidding on this work. Then we received a letter from WJE dated January 28, 2009 which stated that WJE wanted to rescind their drawings (see Attachment C).

In our opinion, no reasonable person (especially not any qualified engineer) would recommend securing the plywood by drilling into the precast panels that are already cracked, loose and which have connections at risk of failing. WJE's proposed method is risky, and WJE does not appear willing to accept all liability if something were to go

wrong with an installation based on their board up methodology. We have clearly stated in a previous letter to you that we are not aware of any methodology that can be used to safely secure the board up. Based on all of the above, please tell us how Safeco, who is responsible for both the inadequate board up by ACT Catastrophe and WJE's dangerous and negligent "solution," is going to address these issues which we agree need "timely remediation."

We observed distressed (two bay wide) corner window frames that are completely missing the head attachment angles, have missing or broken fasteners at the head attachment angles, have intermediate vertical channels that have separated from the intermediate window mullions, and intermediate window mullions that have pulled loose from the floor slab due to the apparent failure of the attachment bracket or fasteners. It appears that the worst conditions were temporarily covered with plywood. However, many other similarly distressed conditions have not been covered with plywood.

Why is it that "many other similarly distressed conditions have not been covered with plywood?" Safeco, along with their contractor, ACT, were the ones who decided what areas should/shouldn't be boarded up.

Our preliminary opinion is that due to a combination of likely insufficient original design and improper installation it is reasonable to assume that the winds associated with Hurricane Ike was the cause of the distress to the "two bay" wide windows located at each corner of the building.

We do not accept Dale Fuhr's "preliminary opinion" or any opinion he may have regarding the design or construction of the insured property. Although Mr. Fuhr works for an engineering firm, WJE, he is not a registered Professional Engineer in Texas or any other state to our knowledge. Please correct us immediately if our understanding is incorrect. Mr. Fuhr can transmit signed and sealed engineering opinions for WJE, but we do not accept Dale Fuhr's opinion. We do not believe you and others at Safeco have a basis to rely upon his opinions.

Any engineering opinion (whether a "preliminary opinion" or any other type of opinion) must be issued by a properly qualified engineer and be substantiated by facts and calculations, not general statements, such as the statement above that damage is "due to a combination of likely insufficient original design and improper installation." It is improper and unethical to make such statements without supporting evidence. Also, in engineering we can not "assume." We expect opinions to be based on facts, calculations and other appropriate evidence, not assumptions and likely scenarios.

The original intermediate mullion attachment methods consist of many different types of bracket materials, fastener methods / patterns, and appear to be insufficient and may not have been in compliance with the City of Houston Building Code in effect at the time of construction. The

attachment of the aluminum channel to the face of the intermediate mullion also appears insufficient and may not have been in compliance with the same code.

This building was designed by Walter Scarborough and engineered by Ellisor Engineers Inc. Ellisor was one of the most experienced and respected engineering companies in Houston at that time, and their reputation was one of the best in the nation. Dr. Joseph Colaco, Larry Whaley, and other great engineers came from Ellisor Engineering. Mr. Dale Fuhr does not know about the design of the building, since he has not reviewed the architectural and structural plans to our knowledge. Furthermore, even if Mr. Fuhr had access to the design documents, he does not have the qualifications to give an engineering opinion, as he is not a registered Professional Engineer to our knowledge.

Dale Fuhr also does not know about all the structural connections and whether or not they were in compliance with Houston's building codes, since he was not involved in the design and construction of the building. Can Mr. Fuhr tell us what the City of Houston Building Code was in 1973, and how he assumes or guesses that Ellisor Engineering did not follow the code? Ellisor was the structural engineer on most of the high-rise buildings in Houston as well as other major urban cities in the United States, including New York, Los Angeles, and Chicago.

Furthermore, the building was constructed by H.A. Lott, one of the best contractors in Houston at the time. H.A. Lott also was involved in many of the major high-rise projects in the City of Houston. I know that Dale Fuhr must know of their great work and reputation in 1973, as well as that of Walter Scarborough and Ellisor Engineers. Mrs. Parker, we suggest that you ask Mr. Fuhr about the reputation of the companies that were involved in the design and construction of this project.

Regarding the construction documents, we have located them at the City of Houston and are working diligently to obtain them and distribute them to all parties involved in this claim. However, the City of Houston considers them to be copyrighted, and the authors are deceased. As of today, we have not yet obtained permission to get copies of these documents.

We observed approximately 106 previously repaired exterior cracks in the precast hollow core wall panels. 73 of these cracks were located across the extreme corners of the panels. A few of these were thin exterior cracks that appeared to have paint, sealant or adhesive materials within the crack cavities. Due to the finishes that were previously applied to the interior face of the precast hollow core wall panels, we were unable to observe or evaluate the interior face of most precast panels. However, we did observe five locations where open cracks existed across the interior corner of the precast hollow core wall panel. There was some evidence that these interior cracks had occurred prior to a coat of paint or wall sealer being applied, indicating that these cracks occurred before Hurricane Ike.

We must clearly state that most of the interior open cracks and the interior panels do not have a coat of paint or wall sealer on them. In cases where these interior surfaces are painted, it is quite clear that no crack existed when they were painted as there is no seepage of paint or sealer into these cracks. Furthermore, with all of WJE's work, they did not observe all, or even a representative sample, of the interior panels. WJE only observed the interior side of the panels on the two floors. On these two floors alone, WJE noted 5 cracked panels, 4 of which were cracked at 45 degree angles which is very dangerous. The question is...why didn't WJE inspect more panels for interior cracks, since most of the stress is concentrated on interior panels at the corners of the building?

Even more importantly, why did Safeco not authorize WJE to check the interior corner panels? I have been stating repeatedly since the hurricane occurred that the corners of the building (where the X-bracing is located) went into severe stress due to the high velocity of wind. The corners of the building are always subjected to more stress, torsion, and deflection which induce major stress on the building elements, including the panels, sheetrock and windows.

Any reputable engineer will know that the corners of the building are subject to tremendous stress, torsion, and deflection from lateral loads and hurricane loads. However, Mr. Fuhr may not be aware of this, as he is not a registered Professional Engineer. The alternative is that he is not giving an honest reflection of damage. You can guess as to the motives for WJE to do this for Safeco.

It is my impression that Safeco has hired an engineering firm that is looking for ways not to provide us the benefits under the policy, but to point out every reason not to pay for the damage and situation caused by Hurricane Ike.

During a meeting with Medistar, Safeco Insurance Company, Nelson Engineering, TC3, Meridian, Adjusters International, and Boyd Engineering held on Thursday, January 22, 2009, Monzer Hourani, P.E. (CEO of Medistar) reported that he had observed a crack near the bearing end of a single hollow core floor panel supported by a perimeter structural steel beam. He was not specific as to the location of this cracked floor panel and we have not located or observed that condition.

WJE and Dale Fuhr did not inspect (nor did they request from us the right to inspect) the interior side of all the precast panels. WJE limited their inspection to the few locations where the panels were already exposed due to the sheetrock having been previously removed. In these few locations alone, WJE inspected 5 interior panels which were cracked (4 of which were severely cracked). Based on these findings, any reasonable engineer would have expanded their investigation to ensure that similar cracks were not present on the remaining floors. Instead, Mr. Fuhr is asking me about one single hollow core floor panel crack, while we have over a thousand hollow core panels in this building that Mr.

Dale Fuhr and WJE elected not to inspect properly. Also, why did WJE not take out the 2-inch concrete topping off of the floor panels bearing on the steel beams to at least inspect the safety of the floors?

Since the existing plywood covering may not provide adequate support conditions, WJE also recommends that tenants not be allowed access to any office spaces where plywood is currently covering the window opening. Workers performing work in those offices should also be notified of these possible hazardous conditions and take appropriate safety measures. Additional temporary plywood or restraint methods should be considered by their engineer for other distressed window frames.

This is just amazing. Not only did Dale Fuhr and WJE give an inadequate solution to the existing plywood board up caused by Safeco and Act Catastrophe's bad installation, but then WJE subsequently sent us a letter stating that no one is to use their designs and calculations. WJE attempted to rescind their work, because they found out in the January 22 meeting at Medistar that their "solution" of bracing back the plywood board up to the hollow core panels that are cracked is not a safe solution. Mr. Fuhr and WJE realized from comments made by both Gary Boyd and me that their proposed methodology was incorrect and dangerous to install. Therefore, WJE is now expressing concern about the safety of people, including the contractor and tenants in the building.

This is strong proof of WJE's irresponsible design of attaching inadequate and unsecured plywood to loose and cracked panels. WJE's incorrect work is clearly negligent, has caused substantial delays in the restoration of this property, and most egregiously, has endangered the lives and safety of people.

Our observations and recommendations are based on the recent evaluation of our exterior and interior building field notes. WJE has not been provided or reviewed any contract documents or original design information that would aid in understanding the probable cause of the observed precast hollow core wall panel cracks. Because we have not reviewed these documents and have not investigated these conditions, it is our preliminary opinion that these conditions may be original design or construction related. For example, the previously repaired precast hollow core panel exterior cracks do not appear to have any pattern of cracking that would suggest that the distress was caused by Hurricane Ike on September 12 and 13, 2008.

Regarding WJE's "preliminary opinion that these conditions may be original design or construction related," Mr. Fuhr does not appear to have any basis for this opinion, or the proper qualifications to issue any opinion. Safeco and their properly qualified consultants must prove to us that the design and/or construction of the insured property is inadequate, if Safeco is going to attempt to use these statements as a basis to deny the claim.

WJE recommends that an engineer licensed in the State of Texas be retained by the Owner to evaluate these conditions. Pending final repair or replacement of these materials, efforts to design temporary restraints or better secure these materials (as well as any other unknown distressed materials not observed or mentioned) should be considered a high priority. These temporary repairs should be engineered and designed to meet the current City of Houston building codes.

Both WJE (in their statement above) and Safeco (see attached e-mail from Sandy Parker dated February 2, 2009 at Attachment D) have recommended that the Owner retain a licensed engineer to further evaluate these conditions. However, it appears to be Safeco's position that since the Owner does not accept WJE's board up methodology, the Owner must retain an engineer to develop an acceptable methodology and that the Owner must bear the associated cost. Safeco appears willing to pay for the new method to be installed, but not for the engineering fees, as Safeco has already paid WJE for their work.

Please advise us immediately as to why it is the Owner's responsibility to correct a substandard board up performed by ACT Catastrophe. Safeco recommended ACT Catastrophe and paid them for their substandard work. Then to correct this error, Safeco hired WJE to develop a board up methodology which was also improper. It is not the Owner's responsibility to correct either one of these issues. Why should the Owner be required to expend funds to solve a problem created by Safeco and ACT, especially when the Owner has been told by the Insurer that they will not be reimbursed for these costs?

Furthermore, in the above statement, Mr. Fuhr is intentionally vague by referring to repairing or replacing "these materials" and securing "these materials" because he is avoiding having to directly refer to replacing the **panels** or securing the **panels**. This is unprofessional, irresponsible, incorrect, evading the truth, misleading, misrepresenting the facts, and further damaging the insured property.

This letter is to hold WJE and Dale Fuhr, individually and collectively, responsible for additional damage to this building. It is a dishonest procedure by Safeco to obtain "cooked" reports based on fabricated lies or unsubstantiated statements. These unethical business practices are now backfiring on Safeco, since their first engineering consultant, EFI, was wrong and was fired by Safeco. Safeco's second engineer, Nelson Architectural Engineers (NAE), also issued an erroneous report on the building (Hurricane Distress Analysis III) and, by issuance of his second report on the building (Hurricane Distress Analysis IV), has admitted such. NAE's second "corrected" report is still wrong, unprofessional, vague and "cooked" for the advantage of Safeco not to pay us what we deserve. However, the worst disaster besides Hurricane Ike is Safeco and WJE.

**February 13, 2009**   D. Axelson (on behalf of M. Hourani) sends email re: delay in WJE report and delay in settling claim. See Attachment 02.13.09 A.

S Parker Response: (1) We are proceeding under a Reservation of Rights (2) Safeco doesn't have WJE report to send you (3) Safeco is waiting for Medistar's estimate, audited bill, required documents, Proof of Loss, and Engineers Reports. See Attachment 02.13.09 A.

**February 14, 2009**   WJE issues "Exterior Wall Condition Survey" on February 13, 2009. S. Parker emails WJE "Exterior Wall Condition Report" to Medistar the next day. See Attachment 02.14.09 A.

*Comment*: Although this report appears to be quite comprehensive, it does not include a thorough investigation of interior panel cracks. In addition, the report contains numerous assumptions and unsubstantiated conclusions.

M. Hourani's response to WJE's Exterior Wall Condition Survey dated September 22, 2009 is attached. See Attachment 02.14.09 B.

The entire text of this response is included below.

September 22, 2009
This report is Monzer Hourani's response to WJE's report prepared for Safeco, dated February 13, 2009.

All direct quotes from WJE's report are annotated in quotations and italics.

WJE's report, dated February 13, 2009, is very contradictory, without any proper engineering principals and calculations and based on guessing and fabrication in order to place the blame on "pre-existing conditions", instead of real facts and engineering principals and calculations.

On one side, WJE praised Dr. Joseph Colaco, who was the structural engineer on this building, and, in my opinion, he is still one of the best engineers in the nation. Please see WJE project information, dated February 13, 2009. Also, the original contractor, H.A. Lott was considered one of the best construction companies in Houston and worked with Dr. Colaco on many of Houston's high-rise buildings, which have never had construction problems. As structural engineers, his firm also designed the connections of the curtain wall system and all the connections of the precast hollow-core panels to the floor. Furthermore, these reputable structural engineers with great experience also had the responsibility to supervise the construction, including the glass, curtain wall, precast connections, and the City of Houston

inspection departments and the lender's inspectors have all checked the construction and connections due to the high quality of the design and construction team. In consideration of the excellent design and construction of this building, this is why this building has been standing without any single problem since 1973, and now WJE and Safeco are trying to blame it on defective design and construction which is absurd.

Medistar has done due diligence on the building and garage, and we had 3 consultants inspect building when it was purchased. **There was not one single structural problem with the entire building. Inspections by Gresham Smith, one of the leading architectural and engineering firms in the U.S., Terracon's major inspection of all the building including the panels and façade, and Floyd Cooper, P.E.'s inspection of the structural integrity and precast panels, all confirmed that the building was in very good shape structurally and architecturally. Adding to all the above, we have 16 letters from all the contractors and subcontractors who worked on this building from 1997 to 2007.**

WJE stated that the damage to the corner windows *"was from original inadequate window wall design, fabrication and construction".* How did WJE determine this? How can they prove that these damages were **NOT** caused by Ike?

WJE's statement, *"the distress that was previously repaired at the corner of hollow core panels was obviously prior and not caused by Ike".* WJE is simply misrepresenting the facts. There were no repairs at the hollow core panels at the corners, because you are trying to confuse issues.

Simply stated:
1. If there are cracks in the outside surface of precast hollow core panels, it is only shrinkage and temperature cracks and **NOT STRUCTURAL** cracks.
2. The major inside panel cracks are structural new cracks that you have not even examined. WJE spent Safeco's money and delayed us with their unprofessional reports that we have previously proved were wrong.

Now WJE's statement on Page 5 at the end of the first paragraph of conclusion states: *"There are only several locations where these previous corner crack repairs show MINOR distress".* This alone is a very strong example of WJE's misrepresentations. You need to look at our latest file that shows over 100 corner panels

that are structurally cracked that you can put you hand in these fresh cracks. You can also find a lot of loose concrete and other elements in these cracks. WJE only checked according to all of your previous written statements, Floor 13, because it was empty. WJE wrote that 5 panels were inspected and WJE only found 4 panels that have inside cracks.

At my direction, we have inspected all the floors, and we are including in this report the photos of 100 panels that are structurally cracked and very unstable that even presents a danger for the lives of others.

Your inspection and the time it took to complete it resulted in wrong and misleading conclusions. You also have a lot of inspections and alleged engineering reports and hours on your unprofessional report, spending your client, Safeco's, money and placing this building in a completely destructive situation, and I believe WJE's primary aim is the fees and money. Just look at the last paragraph of Conclusion, Page 5 that states: *"There are existing conditions with the exterior wall system that we view as insufficient and need to be addressed as soon as possible. In particular, more substantial temporary bracing/support of the corner windows need to be installed and isolated spalls in the corners of some hollow core panels need to be addressed".* This statement represents 3 problems with WJE's report:

1. What do you mean by existing conditions with exterior wall system that is viewed as insufficient and needs to be addressed ASAP? You do not elaborate on your vague statement. Are you now referring to interior cracks in panels?
2. You say address ASAP. Why did it take you that long and until February 13th, you did not address it?
3. You state that we need more substantial temporary bracing/support of corner windows that you wanted to brace these windows are plywood to the precast panels that are cracked and failing, that you send and spent a lot of our time and Safeco's time on a wrong engineering concept to brace these windows that you sent a letter to rescind your solution that has a professional seal (that WJE cannot use under the regulations of the State of Texas for Professional Engineers).

Page 6 Recommendations
It indicates that WJE wants *"additional studies and precautionary measures are recommended to be performed by the owner to evaluate distress and questions condition".* Our question is what has WJE been doing for the last 4-5 months? Why did Safeco not address or permit these additional studies?

You even stated previously in one of your letters that you did not have the permission from Safeco to do it; so why did WJE wait until the 11th hour to let us know at the end of February, 2009 that the owner needs to do his study and that WJE did not do it. The owner did his study because the owner does not trust WJE's experience and credibility and also Safeco's motives, and the owner found 100 structural cracked panels that are severely cracked, with many of the cracks extending from the inside to the outside of the panels due to the deflection torsion on the corners of the building to resist the extreme high velocity of the wind on the corners where the structural X bracing is functioning to resist the extended 9 hours hurricane wind forces that in return induces a lot of pressure in the concrete wall panels and damaged and bowed the curtain wall system that the glass and mullions are separated from the windows. Just look at the window separation photos and you can clearly see the corner problems of the building and look at photos to give WJE and Safeco a real picture of the *"not distressed panels"* that even WJE failed intentionally not to address, and WJE will realize their grave mistakes by saying is *"not distressed panels"* while it is so stressed that it cracks at 45 degrees cracks that is representative of structural failure of cracked concrete panels.

That Nelson Engineers made the same mistake as WJE by saying in their report that there are no distressed concrete panels, the question to WJE is why did WJE rescind their drawings? Is it because after our meeting of January 22, 2009, WJE found that they cannot attach their plywood solution to the corner panels because the corner panels are severely cracked and unstable? Please respond to this question.

Also, why did WJE elect not to inspect interior panels that the owner found 100 severely cracked panels? Please respond.

Why did WJE try to confuse everyone on the outside surface temperature cracks of concrete, which is normal and not on the main structural cracked panels? Please respond.

How did WJE know if it was bad design or construction since they did not do a detailed study and blamed it on preexisting conditions? And since they reported that this building was designed by the best structural engineer in the U.S., Dr. Colaco and Ellisor firm that had Larry Whaley, P.E., Mark Thompson, P.E. who worked with Dr. Colaco on the building. Now they are our structural consultants and the same engineers that

designed and engineered this building. Please refer to Haynes and Whaley's report that was done by Mark Thompson, P.E. (Mr. Mark Hopmann was previously working for Haynes Whaley, but they terminated his employment.)

How did WJE find out through engineering analysis and calculations that these damages are not caused by Hurricane Ike? Please respond. (Mr. Hopmann was working for Haynes Whaley. Ask him why he is no longer with our engineering firm.)

WJE rescinded their details of holding the plywood to concrete panels because this owner and his engineers asked WJE how can you attach something (glass held by plywood) to precast cracked panels (that WJE said they also need to be supported and braced). Instead of rescinding their solution, why didn't WJE come with any other solution to satisfy the owner and his engineers? The easy way to save face of WJE and not to admit to their wrong solution is to rescind the sealed drawings, and now we are asking WJE (since under the law of the State of Texas, WJE cannot rescind their drawings) to respond to us truthfully. Is it because WJE made a mistake?

WJE cannot rescind their drawings and we hold WJE responsible for these drawings and responsible for wasting our time on inept reports that now with this damaged building we are getting closer every day to another hurricane season that if we do not do something now, this building will not be able to withstand another hurricane. We need real solutions.

Regarding the Nelson Report (February 4, 2009) Plumbness Survey comments, WJE and Nelson both hired by Sandra Parker of Safeco to deal against the insured on Page 7 of WJE's report. *"Figure 4 illustrates a summary of the provided plumbness data by building elevation. It should be noted that the largest out-of-plumbness measurements (4.8 inces) were taken at the third and forth 1/5- points at the southwest corner of the building. . . . Such a pattern was not found."*

First the 4.8 inches — WJE that did not do a study themselves on the deflection and surveying of the building admitting that there is 4.8 inches out of plumbness deflection. Also they do not have the idea that this building did not deflect gradually, but the building has deflected and rotated in different directions

due to the Ike variable wind forces that lasted 9 hours. During the 9 hours, the wind was not only from one direction but from different directions due to the rotational aspect of the wind hitting the corners of the building that the four corners are very much subjected to the wind forces and, therefore, the X bracing was resisting the wind and the corners of the building twisted in different direction and the precast panels tried to resist the wind pressures and, therefore, we ended up with 100 structurally cracked panels and the building is now out of plumb.

After Medistar asked Nelson to send the GBI survey, Nelson did not send the survey but Nelson also did not answer 21 questions that were sent to Sandy Parker to give to Nelson. Nelson only answered 2 questions vaguely.

WJE, Nelson and Sandra Parker all know that until today we do not have the survey data of the building. The question is why? Safeco hired Nelson; Nelson hired GBI for surveys. We sent 21 questions to Nelson on the survey, and we received only 2 responses. What is the reason that GBI will not give Nelson any survey data except under subpoena or court order? Nelson hired and paid GBI for survey data. Why will GBI not give their survey data to Nelson? In this case, how can Nelson properly evaluate the deflection and twisting of the steel structure if they do not have data? Please respond.

Therefore, Medistar is now hiring a new engineering and survey company, Pepe Engineers, to conduct a major survey to find if the building is plumb.

On Page 9 of WJE's Report of February 13th, *"Description of Temporary Plywood Boarding Already Installed on Building",* the plywood was installed by Safeco representatives at the direction of Sandra Parker. According to WJE, the plywood is not adequate and possibly by screwing the plywood to the existing concrete pre-stressed panels, it damaged the pre-stressed reinforcing strands in the hollow core panels. Adding to all of this bad work, sloppy solutions and damages from Safeco, WJE is now coming again to bolt the plywood to the concrete panels and damage again the reinforcing strand and also neglecting that the concrete panels are cracked and unstable. WJE's solution is dangerous, contrary to any engineering rules and principles, unsafe and structurally unstable. Therefore, WJE has rescinded its foolish and

deficient solution after realizing their mistake and now they blame it on the owner not to do it.

On Page 10 of WJE's Report of February 13th, *"Types of Distress Observed", the last paragraph, "Interior Corner Cracks (Photographs 19 and 20)"*, WJE states that only five (5) interior concrete panels are cracked. This is an insult over injury. Please refer to our 100 cracked interior concrete panels that have lost their pre-stressed reinforcing strand that is completely damaged without any more pres-stress force to hold the concrete panels together, and most of these structural failure cracks are at the building corners that were twisted because the building is very narrow and tall and Ike was a destructive hurricane in terms of wind forces and duration of the 9 hours hurricane force winds. How can WJE also analyze the building behavior and deflection if they do not have the right data from Nelson – because Nelson hired GBI and GBI will not give their original data to Nelson, Safeco or WJE. It is simply amazing, and as the owner of a deflected and cracked building, we deserve honest and open answers and surveys. We suspect there is something very wrong between Nelson and GBI, and we need to have a face-to-face meeting with Nelson and GBI to answer many questions that we have. Safeco must arrange this meeting since Nelson reports to Safeco and GBI was hired by Nelson and Safeco.

WJE's report is a failure by itself because it is misrepresenting all the real facts and damages that anyone can see it and know it except WJE, because they represent the interests of Safeco Insurance.

The remainder of WJE's report is wrong and full of misrepresentations. As a matter of fact, on Page 21 of WJE's report, under *"Protective Measures"*, any one can see that even WJE is extremely concerned about the stability of the concrete panels and the measures taken to brace the outside panels and the glass and to provide the temporary supports, anchors, braces and waterproofing and other critical measures. The question to WJE, Nelson, Safeco Insurance and Sandra Parker is "Why do we need all of the above and the honest response is that the building was damaged, twisted, cracked due to Hurricane Ike on September 13, 2008.

See Haynes Whaley response to this report at Attachment 02.17.09 A.

**February 17, 2009**  Mark Thompson, Executive Vice President with Haynes Whaley, issues response to WJE "Exterior Wall Condition Report." See Attachment 02.17.09 A.

**Excerpt:**
"In our opinion, WJE failed to unequivocally demonstrate that the damage was due to a design or construction defect. The insurance company and their agents have a burden of proof and must undertake a thoroughly exhaustive investigation to validate their position that the damage to the building was not caused by the unique conditions imposed by Hurricane Ike."

**February 19, 2009**  M. Hourani, S. Davidson, and G. Boyd have phone call with S. Parker to discuss unresolved questions Medistar has regarding GBI survey, and asks Ms. Parker to obtain the answers from Nelson and GBI.

S. Parker emails advising Medistar to stop contacting her experts due to confidentiality concerns. See Attachment 02.19.09 A.

**February 24, 2009**  S. Parker forwards Apollo BBC Report as requested by Medistar. See transmittal email at 02.24.09A. See report at 01.27.09A.

**Comment:** Apollo BBC is an engineering consultant to NAE. However, NAE does not refer to its own consultant in either Hurricane Distress Analysis III, the original building report, or Hurricane Distress Analysis IV, the "corrected" building report. Medistar only became aware of this consultant and this report because WJE referred to Apollo BBC in their February 13, 2009 report.

Page 6 of this report states, "The combination of failed lateral brace connections and discontinuous vertical mullion segments result in a severe structural inadequacy that present a safety concern regarding the potential for occupants to penetrate through the curtain wall from the interior." This appears to be a serious safety concern that should have been immediately communicated to Medistar.

**February 25, 2009**  G. Boyd issues letter requesting that GBI answer 21 questions regarding the survey GBI performed at Twelve Oaks Tower and that GBI certify their answers. D. Axelson emails Gary Boyd's letter to S. Parker.

Response: S. Parker forwards GBI's "answers" regarding Medistar's survey questions on March 3, 2009.

A separate timeline of events (and all supporting documents) related to attempts to obtain the GBI survey data is attached following this general timeline.

**February 26, 2009**  Medistar receives additional $500,000 advance.

**March 6, 2009**  D. Axelson asks S. Davidson to file a Proof of Loss for rent abatements because Safeco is not acting in good faith because Sandy Parker won't

give answer regarding approval of abatements almost six months after Hurricane Ike (Attachment 03.11.09A).

S Parker Response: "We do not disagree with a 30-day abatement..." (Attachment 03.11.09A).

*Comment*: This response was incredibly frustrating because Medistar wanted positive confirmation that Safeco would consider the abatement to be a valid claim expense before the tenants would be notified about an abatement being granted. In an email to Lee Karkabi dated October 1, 2008 (see Attachment 10.01.08A), Sandy stated that "we will probably have to give a months rent back to the tenants and possibly another (2) weeks as each unit is repaired." Now, over five months after making this statement, S. Parker will still not provide a firm commit to reimbursing Medistar for this expense.

| | |
|---|---|
| **March 9, 2009** | Boyd Engineering issues "Interim Engineering Report, Number Three" regarding NAE's February 4, 2009 report and WJE's February 13, 2009 report (see Attachment 03.09.09A). |
| | D. Axelson sends binder of Paladin costs to date to S. Andersen by Federal Express and emails summary information of costs to date to S. Parker (Attachment 03.09.09B). |
| | S Parker Response: She asks whether we are sending supporting documentation and states that certain items will not be covered, ie. Boyd Engineering, Armadillo Glass, etc." (Attachment 03.09.09C). |
| **March 10, 2009** | D. Axelson and D. Powell send the following documents to S Parker via Federal Express: (1) Adjusters International's 505-page Estimate Binder (2) notarized Proof of Loss form (3) letter signed by D. Powell (4)subcontractor estimates (5) Gary Boyd's "Interim Engineering Report, Number Three and (6) Don McIntare's Roof Report. See Attachment 03.10.09A. |
| **March 11, 2009** | Confirmed Federal Express delivery of Proof of Loss to Safeco |
| | DA requests confirmation that Safeco will reimburse $124,190 for 30-day rent abatement (Attachment 03.11.09A) |
| | S Parker Response: "Please see my previous responses to this request." (Attachment 03.11.09A). |
| **March 12, 2009** | S. Davidson emails that he spoke with S. Parker and she has not received Proof of Loss yet. It may have been sent to India to be scanned (Attachment 03.12.09A). |
| **March 17, 2009** | D. Axelson emails Gary Boyd's March 9, 2009 report to S. Parker (although it was previously sent on March 10, 2009 with the Proof of Loss). See Attachment 03.17.09A for transmittal email. |

S. Parker acknowledges receipt of Medistar's Sworn Proof of Loss Statement and sends Abeyance Letter. See Attachment 03.17.09B.

**March 19, 2009**    S. Davidson emails S. Parker that (1) he's never seen a Proof of Loss put into "abeyance" and (2) Medistar will provide meterologist report, Haynes Whaley report, and (3) analysis of interior cracks and photos and photos (Se Attachment 03.19.09A).

**March 20, 2009**    Response: S. Parker states that the claim is in abeyance because Safeco wants to receive all information before making a coverage decision (Attachment 03.19.09A).

Medistar sends LRC meteorologist report, Interior/Exterior Panel Crack Analysis and Photos to Safeco via Federal Express.

**March 24, 2009**    Haynes Whaley issues report addressing NAE's "Hurricane Distress Analysis IV." See Attachment 03.24.09 A.

### Excerpt/Conclusions:
"In conclusion, we believe that the salient points regarding your insurance claim for damages caused to this building resulting from Hurricane Ike are as follows:

1. The building was designed and constructed in accordance with the building code that was in effect at the time of construction. No credible evidence has been supplied to refute this. The building performed adequately for 30+ years, enduring other storm events that could have approached but not exceeded the wind loading conditions from Hurricane Ike.
2. No one knows for sure what the localized wind conditions were at this building during Hurricane Ike. The closest, credibly measured readings indicate wind speeds approaching 110 mph during the storm.
3. The code specified wind pressures that the building was designed to resist are much less than those experience during Hurricane Ike. Based upon our current knowledge of wind forces, we know the exterior of the building was over-stressed during the hurricane.
4. The mere existence damage to the exterior of this building as a result of Hurricane Ike does not explicitly prove that the building or its exterior components were improperly designed or constructed. Credible allegations of improper design or construction must be proven on a panel-by-panel, connection-by-connection, case-by-case basis. Broad, sweeping allegations cannot substantiate the existence of inadequate design and construction.
5. Random and extensive damage caused by Hurricane Ike to many structures in Houston is a testimony to the variability of the magnitude of wind loads inflicted in many areas of Houston.
6. The building remains unrepaired and compromised, subject to further damage in its present condition. As such, it represents a

potential public hazard, and it should be dealt with as soon as possible."

**March 25, 2009**   S. Parker sends revised Abeyance Letter based on new information sent by Medistar, requests another inspection at loss location to evaluate interior cracks and requests information regarding where Haynes Whaley obtained building code information (Attachment 03.25.09A).

**Excerpt:**
"At this time we are requesting an inspection of the loss location in response to your binder that was received today in support of your Proof of Loss. We are requesting a site inspection by our experts, Dale Fuhr and Mark Hopmann of WJE or a representative on their behalf to view all the cracks referenced in this binder. Also, please advise as to how the information was secured by Haynes Whaley to determine that the building was permitted with the City of Houston in April 1972 and the (sic) that the building was designed and permitted under the requirements of the 1963 City of Houston Building Code. Please provide us with the documents or where this information was secured by Haynes Whaley as it is referenced in their report of March 24, 2009."

**Comment:** This documents one of the biggest delays by Safeco which was completely unnecessary. On January 15, 2009, WJE wrote a letter to Safeco recommending that additional inspection be performed on the panels due to severe structural cracks which WJE had been observed in limited locations. However, Safeco would not authorize this inspection. Only after Medistar took the initiative to remove sheetrock at various locations throughout the building in order to inspect for interior cracked panels and reported this information to Safeco, would Safeco agree to allow WJE to expand their investigation.

**March 26, 2009**   Medistar Response: P. Voivedich responds to S. Parker that we need advance planning for WJE inspection of interior cracks (Attachment 03.26.09A).

S Parker Response: S. Parker asks Mark Hopmann and Dale Fuhr to coordinate dates with P. Voivedich (Attachment 03.26.09A).

**March 27, 2009**   D. Axelson sends letter responding to revised Abeyance letter. Medistar asks Safeco to accept the claim and make a determination. Letter further states that a complete inspection of the building should have been performed by Safeco earlier (Attachment 03.27.09A).

**Excerpt:**
"Safeco should have performed a full investigation of the panels from the beginning of this claim process. Since November 2008, Monzer Hourani, P.E., has clearly stated to Safeco and its experts in each and every meeting and in his correspondence that he had concerns about cracked panels and failing panel attachments due to movement of the structure during Hurricane Ike. The panel damage that has been

uncovered by Medistar and Paladin Construction undisputedly validates Mr. Hourani's previously expressed concerns."

| | |
|---|---|
| **April 6, 2009** | Medistar receives check for $1,796,763.96 for undisputed amount & a check totalling $311,774.88 for TRC settlement. Checks did not include a cover letter or any supporting documentation (Attachment 04.06.09A). |
| **April 9, 2009** | S. Parker and J. Whitted attend settlement meeting with TRC. Medistar and TRC reach $410,000 settlement for TRC's remediation work at the property. S. Parker writes check for balance of settlement amount ($98,225.12). See Attachment 04.09.09A. |
| **April 16, 2009** | Pepe Engineering, consultant for Medistar, issues survey report for 4126 Southwest Freeway (Attachment 04.16.09A). |
| **April 30, 2009** | M. Hourani sends S. Parker letter requesting all notes, draft reports, minutes of meetings and all other documentation regarding the claim, so that he will have a chance to give Safeco his input before a claim decision is made. See Attachment 04.30.09A. |
| **May 1, 2009** | Paul Voivedich notifies Sandy Parker of cracks in hollow core floor slab caused by hammering and removal of concrete topping for WJE's inspection and requests an explanation regarding why WJE is causing delays in settling the claim (Attachment 05.01.09A). |
| **May 4, 2009** | S Parker Response to M. Hourani's April 30 letter: We have provided by with all reports and information that we are able to provide. We should receive the WJE report next week and then we can schedule a meeting to discuss. See Attachment 05.04.09A. |
| | S Parker Response to P. Voivedich: Your staff (Paladin/Medistar) was the one who performed the concrete chipping work. Safeco is waiting to receive WJE's report to see if panel cracks are a covered loss due to the hurricane (Attachment 05.04.09B). |
| **May 6, 2009** | Medistar Response: P. Voivedich responds to S. Parker that Paladin's contractor did the concrete chipping because it was requested by WJE. WJE wouldn't rely on the previously exposed areas but wanted additional concrete chipping done. P. Voivedich also asks why WJE waited until now to inspect the broken panels after WJE spent for several months at the property before issuing their initial report on February 13, 2009 (Attachment 05.06.09A). |
| **May 8, 2009** | L. Karkabi emails S. Parker regarding status of the claim, including delays by WJE (Attachment 05.08.09A). <br><br> **Excerpt:** <br> "I am not a claims adjuster and yet I am perturbed at the way this claim is being handled by WJE. When WJE inspected the outside panels, and they only inspected a few, they made the determination that the Hurricane was not the cause of the damage without looking deeper into |

the situation and inspecting the inside of the building. This took place almost four or five months later after the previous inspection."

S Parker Response: We are awaiting additional estimates, documents and reports from the insured. Paladin should have notified M. Hourani or Safeco about the cracks earlier (Attachment 05.08.09A).

**Excerpts:**
"As of this e-mail we are still awaiting supporting estimates, documents and expert reports from the insured. We have shared all of our reports to date with the insured and have provided our estimate of undisputed damages. The original reports from WJE do reflect that their opinion is that the cracks were not as a result of Hurricane Ike based upon the investigation and information they were provided by the insured. Upon receipt of the reports from B.E.I., the weather report and the photographs from the insured a decision was made to do another inspection to respond to the information supplied by the insured."

"Also, when Paladin was removing and replacing drywall and saw these cracks shortly after the loss it would have been most beneficial to have notified either Mr. Hourani or Safeco so we could have immediately addressed these issues. Unfortunately again this was not the case."

*Comment:* Unfortunately, Ms. Parker was not informed by Mr. Whitted of this issue. Paladin Construction was directed during the entirety of the remediation by Safeco's consultant, Meridian. Johnny Whitted with Meridian supervised and inspected all remediation work and did not notify Paladin, Safeco, or Medistar about broken panels.

S. Davidson requests information regarding which documents are outstanding (Attachment 05.08.09A).

**Excerpt:**
"Sandy, please clarify" awaiting supporting estimates, documents and expert reports from the insured" I need from you by Monday a detailed list of what you are waiting for from the insured.
As far as we are concerned we have submitted everything that you have requested as well as concise well documented claim. The holdup has been as still is Safeco and WJE not the insured."

**May 11, 2009**   S Parker Response: Issues letter requesting information, much of which was not previously requested (Attachment 05.08.09A).

**May 12, 2009**   Medistar Response: M. Hourani sends letter to Sandy Parker in response to S Parker's email to L. Karkabi. See Attachment 05.12.09A.

*The body of this letter is excerpted below:*

Dear Ms. Parker:

I am disheartened by your letter to Mr. Karkabi. It is full of misrepresentations of true facts and is misleading. I am honestly disappointed. Safeco has placed me in a very unfair situation.

Lee Karkabi has been selling and promoting Safeco for Medistar's projects, buildings, and hospitals for over fifteen years. Medistar never had one claim against Safeco all these years before the disaster of Hurricane Ike. Even today, we currently have twelve properties insured with Safeco. We placed trust in Safeco.

Your first paragraph is wrong. We have supplied you with supporting estimates, documents and expert reports. The "expert" reports which you have provided since the beginning of this claim are wrong and appear fabricated.

First, you hired EFI to evaluate the building. Their report was incorrect. You fired them and have stated that you are not relying upon their findings. After this, you hired Nelson Architectural Engineers (NAE) to evaluate the building. NAE issued their first report showing that the building was out-of-plumb by as much as six inches, but still concluded that this out-of-plumbness was not caused by the high winds associated with Hurricane Ike.

During the December 22, 2008 meeting at the building, Gary Boyd raised a number of questions and concerns regarding NAE's drawings which were supposedly based on data received from their surveyor, GBI. Dr. Nelson was unable to resolve any of these questions or concerns in the meeting. One month later, during the January 22, 2009 meeting at our office, Dr. Nelson admitted that NAE misinterpreted the survey data it had obtained from GBI, and therefore, his calculations were incorrect.

On February 4, 2009, NAE issued a report "clarifying' the GBI survey data. Although Dr. Nelson's data changed materially, his conclusion stayed the same. Unfortunately, after thoroughly reviewing NAE's revised report, it is our belief that NAE's revised report may contain as many mistakes as the first report.

In an effort to understand Dr. Nelson's "logic," we (along with Gary W. Boyd, P.E.) requested answers to 21 specific questions regarding the GBI survey data. These valid and important questions were asked in order for us to be able to clarify the survey concept, methods, and resulting data and findings.

As you did not want us to contact your consultants directly due to "confidentiality" concerns, we forwarded our questions to you. We waited for a reply and finally received answers to only two of the 21 questions, while GBI refused to provide any further answers (emphasis added). Furthermore, even the two answers provided did not correspond to the questions which we asked.

What is going on regarding this issue? Why won't Dr. Nelson provide us with the GBI survey information we requested? As the building owner, we have the right to understand how and why NAE made a mistake in their original report and was forced to issue a revised report. These reports have the potential to negatively impact the value of the building and the benefits due. Therefore, Safeco has the obligation to truthfully disclose all relevant information regarding these reports to us.

Another one of Safeco's "experts," WJE, is still in the picture further complicating and delaying the settlement of this claim. WJE issued their "comprehensive" report on February 13, 2009 which stated that their opinion was that the majority of the cracks in the hollow-core wall panels were not the result of Hurricane Ike. In our opinion, WJE's report is even worse than that of NAE. WJE spent months at the building and still issued a report without thoroughly investigating the cracks found on the interior side of the panels.

Displaying a stunning lack of professionalism and engineering ethics, WJE issued a letter on January 15, 2009 stating safety concerns with the interior panel cracks on levels 9 and 13 of the building. After identifying a safety issue, how could WJE not think it was necessary to perform additional inspection of other panels to see if similar conditions existed elsewhere? The real question is...was it WJE who made this choice not to investigate or was this decision dictated by Safeco? During the January 22 meeting, we directly asked you why WJE was not expanding their testing of the interior cracks, and you indicated that you did not feel that it was Safeco's responsibility to perform this level of testing.

WJE is the same Safeco "expert" who came up with the engineering recommendation to tie the plywood covering the broken windows to the concrete panels using Hilti bolts which would have destroyed the integrity of the concrete panels. Based on their limited observations, WJE found out the concrete panels were unstable and unsafe due to the corner cracks at the attachment points and could not be used to safely brace the plywood. Therefore, WJE rescinded their drawings and issued their incomplete report on February 13, 2009.

In this report, WJE only reported five cracks on the interior side of the concrete panels because WJE only looked at a limited number of panels on floors 9 and 13. Medistar had to take the initiative to remove sheetrock to inspect additional panels for similar cracks, and we quickly located over 80 panels with severe structural cracks resulting from Hurricane Ike. We had to send you labeled photos of cracked interior panels throughout the building before you would allow WJE to perform this additional inspection which should have been completed in January (if not sooner.) WJE requested to again go the property to perform this additional work, thereby again disrupting tenant operations and delaying settlement of the claim. In addition, WJE requested that more concrete topping be removed potentially damaging more hollow-core floor planks.

In our opinion, WJE is not reliable (emphasis added). WJE's and Safeco's delays have put all of us in tremendous danger with hurricane season approaching quickly.

With regard to the second paragraph in your letter to Lee Karkabi, it is unfair. You continually refer us to our "Duties in the Event of a Loss." In this specific e-mail, you state that the presentation and support of the claim is the responsibility of the insured. Medistar, Paladin and all of our experts, engineers and consultants have gone beyond the "call of duty" to provide you, at significant cost to us, with information, reports, photographs and surveys of the many cracked panels that Medistar located **but that WJE failed to find and report** despite the fact that Safeco had access to the property for months (emphasis added). Safeco's investigation and adjustment has taken an unbelievable amount of time. In addition, Safeco also waited until April 2009 to check additional connection points of the concrete panels to the floor slabs. Removing additional concrete topping and potentially fracturing a hollow-core floor slab is dangerous and, in our opinion, was only done to try to prove that the cracks were a pre-existing condition.

During the January 22 meeting, I called Mark Hopmann with WJE a "hired gun." How else could I view an engineer who performs an incomplete, unprofessional investigation and issues an unsupportable opinion based on the results? We will not put any faith in WJE's final report, not only because they have committed major engineering mistakes, but also because their reports are biased and untrue.

You claim that you have a lack of information about the building. We told you, Dr. Nelson, and WJE to go to the City of Houston to view the plans of the building. Medistar representatives went to the city offices to study these drawings with our engineers and consultants. Safeco's engineers and consultants were free to do the same. Why are you confused by the lack of information when we told you where the information could be obtained?

In your third paragraph, you state that you are waiting upon the findings of your experts, WJE, to have a final assessment of damage under the policy. I can tell you now that because of the previous mistakes, cover-ups, bad recommendations and wasted time of WJE, we do not have any trust in what WJE will find. Why do you?

Your last paragraph deeply upset me. The claim and loss have not changed since day one. Either you forgot our initial meeting or you are choosing to play games with the truth. Since day one, I told you that this building, with only 8,400 square feet per floor and 17 stories high with hollow core floors supported by steel frame that has X-bracing on the outside, was subjected to tremendous wind pressures during Hurricane Ike that twisted, deflected and put tremendous stress on the four corners. This stress was then transmitted to the concrete panels and caused the breakage of the windows and cracks in the concrete panels.

I told you (and you agreed) that it would be prudent and vital to this building to take all the panels and skin off and professionally survey the steel frame of the building . This is not to be confused with the survey performed by NAE's consultant, GBI, of the outside surface of the concrete panels.

Your further state that "when Paladin was removing and replacing drywall and saw these cracks shortly after the loss it would have been most beneficial to have notified either Mr. Hourani or Safeco so we could have immediately addressed these issues." Ms. Parker, this is the most unfair and untrue comment and is really upsetting. As you know, I told you many times while WJE was performing their inspections and study on all the panels that I believed the panels were cracked and failing. When WJE issued their report showing that they identified only five interior panels that were cracked, I, as both the owner of the property and as a Professional Structural Engineer with experience that you and Safeco are clearly aware of by now, asked Paladin to remove interior sheetrock on the corners of the building, even in occupied areas. Based on my suspicions about how the building moved, I told my employees and consultants ahead of time that they would find 45 degree cracks in the corner panels, because the building twisted resisting the hurricane forces and went into torsion resulting in the panel cracks. Although we did not remove all of the interior sheetrock and expose all of the panels, in our limited investigation we found over 80 cracked panels. Based on these results, nobody should trust WJE's findings, as WJE continues to be proven wrong again and again.

The actions of both Safeco and its consultants raise many questions which we cannot understand:

> 1) Why did WJE not check the interior panels during their "comprehensive" investigation of the curtain wall? Based on WJE's January 15, 2009 letter, it appears that WJE wanted to expand their testing. However, based on your comments during the January 22, 2009 meeting, it appears that Safeco would not authorize WJE to perform this work. Is there some reason that Safeco did not want to fully investigate this claim?
>
> 2) Regarding the GBI survey data, why did NAE never provide us with the original GBI data? Why are both Nelson reports wrong? Why did neither Nelson nor GBI answer the 21 questions requested by me and our engineering consultants?
>
> 3) Why did WJE rescind their wrong solution to fix your mistake of installing the wrong plywood in the wrong way to the concrete panels? Why did WJE not do their due diligence and therefore found only five cracked panels, while we identified and have over 80 cracked panels. Why did WJE waste all this

time and not ask sooner to saw cut the floor slabs to examine the connections?

4) Why is this claim taking so much time and why did you send a very unfair and misleading e-mail? Above all, why did you not act a long time ago on my recommendation to take out all the fascia and corner panels and expose the steel frame? Instead, it appears Safeco has spent the last eight months trying to blame all of the damage on pre-existing conditions.

Not only does your e-mail leave a lot of unanswered questions, it brings to light the very unfair strategy that you appear to be executing. I pray that I am wrong, because I thought and believed Safeco would be honest and worthy of trust. I have been patient up to this point, but I do not know what to think now.

Sincerely,

Monzer Hourani
CEO

May 14, 2009

S Parker emails attachments to the WJE report but not the report itself (Attachment 05.14.09A).

Gary Boyd issues "Clarifications to Recommendations of the Interim Engineering Report, Number Three" (Attachment 05.14.09B).

**Excerpt:**

## RECOMMENDATIONS

### (Note: Clarifications are only as added in [brackets] below.)

"It is my professional opinion that *each panel and window must be removed from the building* due to the extensive damages observed and documented and due to the hidden damages that have most likely occurred to the panels and/or to their anchoring systems.

The panels should also be removed in order to observe, survey, and analyze the plumbness and soundness of the structural frame.

Any action less than the above would be extending and prolonging *the clear and present dangers to the public that has existed since [and as a result of] the occurrence of Hurricane Ike*; dangers that were first observed (and presumably reported) by Apollo in November of 2008 and

declared by the BEI report dated January 14, 2009, and which, are hereby again declared."

**May 19, 2009**   Rocco Calaci, LRC Services, issues corrected meteorological report (Attachment 05.19.09A).

**May 20, 2009**   WJE issues report "Exterior Wall Condition Survey - 2nd Report" addressing interior panel cracks (See Attachment 05.20.09A).

See M. Hourani's comments regarding photographs attached to WJE report at 05.20.09B.

See response by Haynes Whaley to WJE's May 20, 2009 report at Attachment 09.25.09A.

**May 21, 2009**   S Parker emails that she "just wanted to let you know that the WJE written report was received today and has been forwarded to Safeco's coverage counsel for review. Upon completion of their review and management's review we will forward to you for your review." (Attachment 05.21.09A).

B. Hodge, Medistar CFO, sends letter to S. Parker regarding dissatisfied tenants/tenant moveouts along with supporting documents (tenant letters, etc.) and requests a response by May 22, 2009 **(no response ever received)**. See Attachment 05.21.09B.

**Excerpts:**
"Our existing tenants, as shown by the attached representative communications, are extremely dissatisfied with the lack of progress with repairing the building and are continually inquiring as to when the repairs will be made. The tenants are threatening litigation for lost business, questioning payment of rent, refusing to pay rent for the building and garage due to this and in one case a tenant abandoned their lease without payment."

"Compounding the above, this building has been leaking from the outside, especially at the corners of the building every time it rains."

*Comment*: Four months after Mr. Hodge made this comment, the situation regarding leaks during rains is still occurring. See timeline at September 23, 2009 regarding photographs of leaks taken on September 22, 2009 which show water infiltrating through the panel cracks.

It is Medistar's opinion that replacement of these panels is necessary as no "repair" can restore the structural integrity of these hollow-core panels. In order to begin such a major replacement, funds need to be received from the insurer. To date, **undisputed amounts paid by Safeco did not include any amounts related to the precast panels.**

**June 2, 2009**   P. Voivedich sends letter regarding S Parker's requested information, including Armadillo contract (Attachment 06.02.09A).

Emails between S. Davidson and M. Hourani regarding Adjusters International's handling of claim and Safeco delays (Attachment 06.02.09B).

**June 17, 2009**  S. Parker sends WJE attachments and wrong WJE report (Attachment 06.17.09A).

S. Parker forwards WJE report, "Exterior Wall Condition Survey - 2nd Report" dated May 20, 2009 (See t Attachment 06.18.09B).

**Comment:** After waiting months for Safeco to authorize WJE to perform a thorough investigation of the panels, WJE finally issues their report on May 20, 2009. However, Safeco holds this report for almost a full month before forwarding it to Medistar for our review.

**June 26, 2009**  M. Hourani emails pictures of widening panel cracks to S. Parker and expresses frustration with the May 20, 2009 WJE report still recommending "further studies".(Attachment 06.26.09A).

**Excerpts:**
"Please see the attached photos that were shot today. Just look at these panels – the cracks are widening."

"…we have waited since September 13, 2008 until almost July, 2009 on your consultants, in their May 20, 2009 report, Page 30, WJE now wants 'further studies and wants to perform 20 additional tasks'…After all this time, why is WJE now recommending on Page 32, Item 20 of 'further studies', they want to do this now? My question to Safeco is after waiting all of this time, why was this not done before? WJE is also now suggesting "protective measures".

**July 1, 2009**  S. Davidson sends letter to S. Parker regarding upsetting phone call between S. Parker and M. Hourani (Attachment 07.01.09A).

**Excerpt:**
"Please be advised that your phone conversation yesterday with Monzer was very upsetting to him because of the structural cracks in the concrete are getting wider due to the heat in Houston. Monzer believes that WJE's report not only wasted a lot of everyone's time, but was also incorrect.

Both Monzer and I have told you our position repeatedly regarding what has happened to the structure and the curtain wall, and we have no further information to add at this time.

**We would like to know what Safeco believes is the undisputed amounts and what they are willing to pay on this claim. In addition, please advise when we can expect a check for the undisputed amounts so Monzer can start repairing the structural problems and damages caused by Hurricane Ike (emphasis added).**

Monzer would like to focus his attention on the repair of the building, especially as we are currently in hurricane season."

S. Parker response included statement that she has not received all requested documents and that Safeco has already paid the undisputed damages. See Attachment 07.01.09A.

Excerpts:
"Please be advised that as of this e-mail we still do not have all the documents we have requested of the insured (emphasis added), but will continue to move forward with the damages of the loss with the information that has been provided."

"Safeco has previously provided you with our expert reports, estimates and payments for the undisputed damages (emphasis added)...We also to date have not received any rebuttal to our estimate of repair only a request for the Limits of Insurance."

**July 2, 2009**

D. Axelson responds regarding requested documents and asks for clarification regarding missing documents as Medistar is not aware of any documents which have not been provided (Attachment 07.02.09A).

Sandy,

I was surprised to have read that you still do not have all of the documents you have requested from us (emphasis added).To the best of my understanding, we have complied with your requests for documents to the fullest extent possible. In some instances, you may have requested documents or other information which we do not have access to and hopefully we conveyed this to you clearly in those cases.

Both Scott Davidson and I have been operating under the belief that Safeco had all of the information necessary in order to make a claim determination, because you have not called or written to tell us otherwise.

Please let me know immediately what specific documents have not been provided, so we can either provide them or indicate clearly that such items do not exist or are unavailable to us (emphasis added). You are also welcome to come to our offices to review any documents you wish to prevent any misunderstandings regarding the information available.

I look forward to your prompt response, so we can act in a cooperative manner and take whatever action is needed to move this claim process swiftly toward completion.

Thank you

Donice Axelson

S. Parker refuses to specify which documents are yet to be received by Safeco because she is busy working with her experts to address Monzer's issues. See Attachment 07.02.09A.

Donice,

I appreciate the response to my previous e-mail. However, at this time I am working with my experts, consultants, etc. to address the issues Monzer and I discussed in our last phone call. I do not want to delay providing Monzer with the information we discussed. So at this time there are outstanding documents, but I am proceeding as instructed by Mr. Davidson to make our damage/coverage assessment with the documents presented to date as per Mr. Davidson there is nothing further Medistar has to send. If we are unable to resolve these damages after securing the above noted information then at that time we will be providing you with a list of outstanding documents and take whatever steps are provided by the policy contract to resolve these differences(emphasis added).

If anyone has any information or wishes to discuss further with me, please feel free to contact me at (630)542-7793. I will be in contact with Monzer as soon as possible with the information discussed in our phone call of Monday, June 29, 2009.

Sincerely,

Sandy Parker, Technical Claims Consultant

D. Axelson responds again regarding requested documents (Attachment 07.02.09A).

Sandy,

I am certain that Monzer is happy that you are working full-time on the particular matter which you and he discussed.

However, your comments that you do not have all of the documents you need indicate that I have not done my job.

If you come across anything where you need additional information, please pick up the phone and call me immediately. The best way to reach me is on my cell phone - (713)470-7075.

Thank you

Donice

S. Parker responds again regarding documents requested (Attachment 07.02.09A).

Donice,

As stated previously I am proceeding as requested by Mr. Davidson in various phone calls and letters. I am not indicating anyone has not done there(sic) job, just simply stating facts. Again, if we cannot resolve and there is a need for these documents I will send a complete list.
However, to resend the prior letters requesting the same information at this time is not necessary as there are other issues that need to be addressed immediately. If you want to review my previous letters to see if all documents have been produced that would be great. If you determine they have maybe it was an oversight on my part. We will be back in touch with you as soon as possible.

Sincerely,

Sandy Parker, Technical Claims Consultant

S.Parker emails D. Axelson to get contractor access to the building today to inspect corner panels. Despite lack of notice D. Axelson arranges immediate access so as not to further delay the claim (Attachment 07.02.09B).

Emails between S. Davidson and S. Parker regarding contractor building access and the purpose of inspection (Attachment 07.02.09C).

**July 6, 2009**

S. Davidson requests that Safeco provide bids from contractors (Attachment 07.06.09A).
**Excerpts:**
"I understand that your contractors have finally completed their inspection today."

"At Monzer's request, I am asking that you provide the contractors findings and figures to me as soon as you receive them."

S Parker Response: Safeco has made no commitment regarding coverage (Attachment 07.06.09A)

Excerpts:
"We made several requests to our experts and contractors. As stated previously to Mr. Hourani, these were done in response to our phone conversation last week and there was not commitment regarding coverage, damages, etc....I also informed Mr. Hourani that I had no authority at this time to settle for anymore damages with the exception of the documents previously submitted by Medistar and all reports, findings, etc. would need to be reviewed with my management.

"So in response to us providing you with copies I am not in any position to provide that information to you until it is reviewed by our management and legal counsel (emphasis added). Please be advised that the recent actions were not a commitment to anything except to clarify the inquiries by Mr. Hourani and if it is determined at that time there is additional damages to be paid we will advise you accordingly..."

Lee Karkabi emails S. Parker re: delay in settling claim (Attachment 07.06.09A).

Excerpt:
"It is now almost ten (10) months since Hurricane Ike caused the damages. We are 37 days into the 2009 Hurricane season, and yet no decision has been made to settle this claim. This is disturbing to say the least. I hope that a decision is reached very soon."

**July 13, 2009**

Dale Fuhr and S. Parker request access for Vaughn Construction to revisit the property today at 2:30pm. D. Axelson arranges access, and S. Davidson asks S. Parker to "keep him in the loop" on this claim. See related emails at Attachment 07.13.09A.
*Comment:* Despite the short notice, we arranged immediate building access in order to cooperate fully in an attempt to resolve this claim as quickly as possible.

**July 21, 2009**

D. Axelson forwards P. Voivedich memo re: WJE unprofessional comments to S. Parker (Attachment 07.21.09A).

S. Parker sends initial response (Attachment 07.21.09A).

Excerpt
"This is not the way Safeco does business and we would expect the same of our experts. Since this is my first notification of this, I am following up with WJE regarding this issue and am presently awaiting their response to Mr. Voivedich's memo to Mr. Hourani."

S. Parker sends 2nd response after speaking with WJE (Attachment 07.21.09B).

Excerpt:
"... it appears there is a difference of opinion as to what may or may not have actually occurred. Inasmuch as I was not present for this

conversation I am not in a position to comment either way. However, I have spoken to my experts to reiterate what Safeco's expectations are from them."

M. Hourani email to S.Parker regarding frustration with project and need for resolution (Attachment 07.21.09B).

**Excerpt:**
"I am frustrated by this never-ending project. We are now almost August 2008, and I stand firm with what I told you about the building. I need an answer regarding when we can have a resolution for our disastrous building."

S. Parker responds that she has received final information from experts and contractors and will provide final decision ASAP (Attachment 07.21.09B).

**Excerpt:**
"**I just received the final information today from our experts and contractors.** I am preparing a report for my management to review and will provide you a final coverage decision as soon as I am able to. At this time I cannot make any additional damage or coverage commitment until everything has been reviewed that has been received."
*Comment*: As of the date of this writing, more than two more months have passed since all information was received by Safeco and still no claim decision has been provided to Medistar.

**July 22, 2009**    M. Hourani emails S. Parker re: settlement of claim and asks her to deal with Scott Davidson on claim matters. See Attachment 07.22.09A.

**Excerpt:**
"I become very frustrated regarding the pace of the claim, my opinions being discounted, and no payments or decisions coming from Safeco."

"I am hopeful that a favorable claim decision and payments are imminent. Please contact Mr. Davidson directly regarding those as soon as you are able. Provide him the information about the decision and when we can expect money."

**July 24, 2009**    S. Parker emails D. Axelson regarding receiving a call from Lee Karkabi about rent abatements. Per M. Hourani, all communication should go through S. Davidson. See Attachment 07.24.09A.

**Excerpt:**
"Just received a phone call from Lee Karkabi regarding a discussion he had with you regarding rent abatement. Please be advised that I have previously discussed that issue with Mr. Davidson and **it is still being reviewed by my Home Office (emphasis added)**."

*Comment*: Medistar has been attempting since January 15, 2009 to obtain written confirmation from Safeco that a 30-day rent abatement for all tenants will be considered a covered "expense" under the policy. See

previous timeline comments on January 15, 2009, March 6, 2009, and March 11, 2009. **Now, more than ten months after Hurricane Ike, Safeco still will not provide an answer regarding the simple matter of a 30-day rent abatement for the tenants at Twelve Oaks Tower, as the issue is (according to Ms. Parker) "still being reviewed by my Home Office".**

**August 4, 2009**   Email from S. Davidson sent to S. Parker by regarding delays in settling the claim and lack of rebuttal from Scott Davidson regarding TC3's cost estimate. See Attachment 08.04.09A.

**Excerpt:**
"When Safeco made a payment for undisputed amounts in April 2009, we requested that you provide us with supporting documentation, including contractor proposals showing scope, methodology of repairs and pricing. Such documents were never provided to us. However, based on our analysis and subsequent discussions with you, we determined (and you concurred) that the April 2009 payment did not include any amount for replacement of the precast panels and associated costs. We believe that these expenses must be incurred to restore the building to its pre-loss condition and represent the largest component of the property damage portion of the claim.

Since Hurricane Ike occurred in September 2008, my client repeatedly stated that the building deflected as a result of the hurricane-force winds and that the panels had sustained damage. On January 15, 2009, Safeco's consultant, WJE, issued a letter which identified structurally significant panel cracks and recommended that additional inspection be performed. Although my client, Monzer Hourani, one of the nation's top structural engineers and I strongly disagree with most of WJE's opinions which are unsupportable by the facts and their recommendations which are not based on proper engineering principles, we wholeheartedly agreed that further investigation of the panels should have been performed immediately.

During the January 22, 2009 meeting at Medistar's office attended by Safeco, Medistar and their respective consultants, you indicated that you did not feel that it was Safeco's responsibility to remove sheetrock from the interior of the building to inspect the panels. Since Safeco chose not to follow the recommendation of WJE or to address the concerns of the owner, Medistar took the initiative to perform such inspection which revealed exactly the type of damage anticipated based on my client's engineering expertise.

Only when my client provided Safeco with photographic evidence of the damage did you request that WJE perform additional inspection of the cracks identified by Medistar. Safeco made this request in the Revised Abeyance Letter dated March 25, 2009.

WJE's second inspection and analysis continued in April and May 2009 and WJE issued their findings in a report dated May 20, 2009. However,

this report was not sent to Medistar until almost a month later on June 18, 2009 as it was under review by Safeco management.

WJE accompanied contractors to the site in early July 2009 in order to determine a scope, repair methodology and pricing. However, as of today, this information has also not been provided to either me or my client.

**My client has been asking for what Safeco believes is the undisputed portion of the claim (emphasis added).** We need that, the basis for it, the benefits owed reflecting that amount, and we will analyze it and get back to you."

**August 7, 2009**    M. Hourani emails letter and 14 contractor statements to S. Parker regarding the non-existence of interior panel cracks prior to Hurricane Ike. See Attachment 08.07.09A.

### Excerpts from M. Hourani letter:

"WJE failed completely in finding the major cracked panels in the entire building at the 4 corners, and they only found 4 or 5 cracks. Now, the entire building is cracked on the corners and roof parapets, and WJE's excuse was that Safeco did not authorize them to conduct a study on interior panels. To make matters worse, WJE blamed the structurally cracked panels on 'pre-existing conditions'...and other fabricated statements which are totally erroneous and not based on any principals of engineering judgment, calculations and factual concepts."

"After listening to WJE's totally baseless allegations and misstatements for a long time, please read the attached letters, documents and testimony of 15 different contractors, subcontractors, construction manager and other people who have worked on all aspects of the building. The contractors' work included all sheetrock on concrete walls, abatement of asbestos and removal of all interior finishes including all sheetrock, tenant finish work, installation of sheetrock wall partitions and all other work associated with tenant build-out."

**"These contractors have all testified that from 1997 until 2007, they never observed any cracks in the concrete panels and, above all, they worked on these panels and if they *had* found any severe cracks (which we now have), they would have stopped working immediately and promptly inform the building owner of the situation."**

**August 11, 2009**    Lee Karkabi email to M. Hourani regarding call to S. Parker re: status of the claim. L. Karkabi stated, "I talked to Sandy Parker this morning and she indicated to me that she did receive your email from last week. Everything is with upper management." (This referred to receipt of the contractor statements sent on August 7, 2009 at Attachment 08.07.09A). See Attachment 08.11.09A.

S. Parker emails M. Hourani also confirming receipt of the contractor statements and stating that "At this time all documents are being reviewed by upper management and our legal counsel." See Attachment 08.11.09B.

**August 12, 2009**     M. Hourani email to S. Parker regarding status of the claim and asking reason for delays. See Attachment 08.12.09A.

**Excerpts:**

"We are puzzled as to the honest reasons we have not received an answer from anyone at Safeco regarding our claim, in whole or in part. Have others at Safeco honestly been working on this matter as fast as they can?"

"With regard to the four corners of the building, it is our understanding that Safeco sent contractors to the building in early July to price the replacement of the corner panels. We expected that Safeco would take this final information regarding scope of work and pricing, along with other previously gathered information, send us the results, and **issue another check to us representing the undisputed amount of the claim (emphasis added).**"

S. Parker Response: We paid undisputed amount in April 2009. We have not committed to paying for panels. See Attachment 08.12.09A.

**Excerpts:**

"**At no time have I indicated that Safeco was accepting the concrete pre-cast panels as part of the Hurricane damages (emphasis added).** I have continually advised you that the undisputed damages were issued to Medistar in April, 2009. The additional investigation is still being handled under a Reservation of Rights and **no commitment or additional payment or coverage has been agreed to or committed to" (emphasis added).**

*Comment*: WJE, Safeco's engineering consultant, submitted their final report on the structural condition of the building's façade on May 20, 2009. It is logical to assume that Safeco would be making a coverage determination based on findings by WJE and/or other qualified engineers before obtaining contractor repair bids.

Why would Safeco send multiple contractors to price replacement of panels if Safeco had not determined that such items would be covered under the insurance policy? Why would Safeco obtain bids for repairs which Safeco had not yet determined was a covered loss? Did Safeco obtain bids to determine the cost of repairs and then determine whether or not they would cover these costs based on a cost/benefit analysis rather than based on coverage determined by the policy? Coverage decisions should be based on policy provisions and thorough and fair investigations by qualified engineers, not cost estimates provided by contactors.

**August 14, 2009**   D. Axelson forwards to S. Parker a letter from a tenant's attorney regarding the unrepaired condition of the building (Attachment 08.14.09A).

**Excerpt:**

"Please see the attached letter we received today from the attorney representing Dr. Sanders, a tenant in Twelve Oaks Tower. The delays regarding Safeco's investigation and adjustment are causing many of these problems with tenants.

Medistar, like all policyholders, expects that payments for property and business damages will come weeks following a loss rather than months. We certainly did not expect it to take almost a full year.

As the Owner, we fully understand our "Duties in the Event of a Loss" which include the repair of the building. However, it is difficult or impossible to fulfill these obligations when sufficient funds have not been received from the Insurer to complete the work. The reason we purchased insurance was to ensure that the necessary funds would be available to restore the property in the event of a catastrophe, such as Hurricane Ike. Don't you think that policyholders buy insurance so that they will have the money necessary to properly fix their buildings after a major loss?

We would appreciate your help in resolving this claim as soon as possible before tenant issues such as this one escalate even further."

**August 31, 2009**   Brueggeman, Johnson and Yeanoplos, P.C. sends draft report regarding loss of rents calculation to D. Axelson (Attachment 08.31.09A).

Comment: The estimate for Lost rents and Extra Expense varies from $2.6 Million to $9.4 Million. The upper limit assumes that the entire building will have to be closed during repairs and all tenants relocated to another building. This includes moving costs and tenant build-out costs which are extensive, especially for surgical space.

**September 1, 2009**   P. Voivedich meets with P. Nilles, President of TC3, to discuss repair methodologies and cost estimates. The results of their preliminary discussions were further discussed in the meeting on September 2, 2009.

See repair cost estimates and related information at Attachment 09.01.09A.

**September 2, 2009**   Meeting held between Medistar and Safeco representatives to discuss repair estimates and methodologies as well as loss of rents calculations. The draft loss of rents calculation prepared by Brueggeman, Johnson and Yeanoplos, P.C. was provided to Safeco at this meeting. See meeting notes at Attachment 09.02.02A.

**Excerpts:**

- Safeco does not agree with Medistar's $21M Proof of Loss. However, they want to try to reach a settlement to avoid litigation and/or appraisal. They will not disclose the amount of reserves and will not pay any more undisputed amount. They want a full settlement and signoff by Medistar. Safeco wants to determine what numbers Medistar would accept.

- Sandy has no authority and would have to get any settlement approved by upper management.

- The scope of repairs has been agreed to except for the "panels in the middle." Sandy conceded that the four corners are in the scope of repairs.

- Paul Nilles discussed construction numbers. His final number for hard costs was $16,762,383.

- Sandy stated that it is Safeco's position that asbestos is not covered. However, she will consult her legal counsel and give us their coverage opinion by Friday, September 4, 2009.

- At Gary's request, Sandy is supposed to request that upper management release some of the funds immediately. Sandy will also have an answer regarding this request on Friday.

- John Nitti is requesting additional supporting documentation regarding the business income loss and extra expenses. He will send a request in writing to Larry Vaile and Pat Bickford by Friday.

**September 21, 2009**    D. Axelson received phone call from S. Andersen requesting Adjusters International's 505-page Wind Damage Estimate previously sent to Safeco on March 10, 2009 in hard copy form and electronic form on a zip drive. Medistar again sends another copy to S. Andersen via overnight mail.

**September 23, 2009**    P. Voivedich sends email to S. Parker forwarding a September 22, 2009 memo and photographs sent by Frank Patout to M. Hourani showing numerous current leaks. Every time it rains, water enters the Twelve Oaks Tower through the cracked exterior panels (Attachment 9.23.09A).

**September 25, 2009**    Haynes Whaley issues report responding to WJE's May 20, 2009 report, "Exterior Wall Condition Survey - 2nd Report." See Attachment 09.25.09A.

*Comment:* Mark Thompson, Executive Vice President with Haynes Whaley, points out *numerous* unsupported statements and speculations by WJE regarding the design of the building and the cause of the panel cracks identified at the building.

**Conclusion**:

"WJE's purported ignorance of insurance provisions is interesting, given that we understand much of their work is directly related to insurance claims. We are confident they are more knowledgeable in these matters than are we. However we assume an insurance company could deny a claim in this matter only if it can be shown that the failures were caused by a defect in design or construction. If that is the case, we stand by our position that WJE has failed to demonstrate such a defect (emphasis added)."